C. L. McPHETRIDGE, Respondent, v. E. P. SMITH et al., Appellants.

[Civ. No. 3788. Third Appellate District.—October 7, 1929.]

C. L. McPHETRIDGE, Respondent, v. E. P. SMITH et al., Respondents; GLOBE INDEMNITY COMPANY (a Corporation), Appellant.

Ralph H. Lewis and George E. McCutchen for Appellants in Civ. No. 3486.

Hartley F. Peart and Gus L. Baraty for Appellant in Civ. No. 3788.

Grant & Bailey and A. G. Bailey for Respondent.

PLUMMER, J.—While this cause is presented to us upon two separate appeals, one by the Hartford Accident Indemnity Company and E. P. Smith, upon a reporter's transcript prepared under the provisions of section 953a of the Code of Civil Procedure, and one by the Globe Indemnity Company, upon a bill of exceptions or transcript on appeal prepared according to the old method, we will, nevertheless, for convenience, consider the cause as presented upon one record, referring to nothing except what appears in the tran-

script on appeal as well as in the reporter's typewritten copy of the evidence introduced upon the trial.

The action was begun by the plaintiff to recover from the defendants the sum of $1,000 alleged to have been obtained from him by reason of the unlawful and wrongful acts of the defendants, E. P. Smith and Glenn Newton, and from the Hartford Accident and Indemnity Company, a corporation, as the surety of E. P. Smith, and against the Globe Indemnity Company as the surety of the defendant Glenn Newton. The defendants E. P. Smith and Glenn Newton were, at all the times mentioned in this action, real estate brokers or real estate dealers, the defendant Glenn Newton having his place of business in the city of Oakland and the defendant E. P. Smith having his place of business in the city of Sacramento. The complaint alleges that on and prior to the eleventh day of May, 1925, the plaintiff was the owner in fee of certain real estate in the city of Oakland, subject to an encumbrance in the sum of $6,000; that at the same time one Thomas E. Garner was the owner of certain real property situate in the county of Yolo, subject to a trust deed in favor of Mary A. Bostwick, to secure a promissory note for the sum of $2,000; that during the months of April and May, of the year 1925, the said Garner and the plaintiff were desirous of exchanging their respective properties, and that the defendants, E. P. Smith and Glenn Newton, and each of them, for a compensation, negotiated and acted for the plaintiff in the exchange of said property; that the negotiations were carried on by said E. P. Smith and Glenn Newton, and that the plaintiff had no personal interviews with the said Thomas E. Garner. While not alleged in the complaint, the record shows that Thomas E. Garner was represented by a real estate broker living in Sacramento by the name of Howard Kerr. The complaint then contains the following allegations:

## "XI

"That in order to negotiate said exchange, it was stated and represented to plaintiff by the said E. P. Smith and Glenn Newton, and by each of them, during the said months of April, and May, 1925, and before the final passing of deeds between plaintiff and the said Thos. E. Garner, that the said Thos. E. Garner was willing to exchange properties with plaintiff if this plaintiff would assume the payment of

a $3000.00 note secured by deed of trust on the Yolo County property of the said Thos. E. Garner, which said deed of trust the said defendants, E. P. Smith and Glenn Newton, and each of them, then and there stated and represented to plaintiff was a first lien on the lands of the said Thos. E. Garner so located in Yolo County. That the said defendants E. P. Smith and Glenn Newton, at said time stated and represented to plaintiff that the exchange price of the lands of Thos. E. Garner in Yolo County was the said lands so owned by Thos. E. Garner in Yolo County, and the assumption of a note secured by deed of trust, then and there constituting a lien on said lands, and which said note so secured by deed of trust was then and there stated and represented to plaintiff to be in the sum of $3000.00. That the said E. P. Smith and Glenn Newton and each of them, attended to the drawing of the conveyances and to ascertaining the title to the lands of the said Thos. E. Garner in Yolo County, and also attended to the securing of a policy of title insurance on the lands of the said Thos. E. Garner in Yolo County.

## "XII

"That said statements and representations so made by the said defendants E. P. Smith and Glenn Newton and by each of them, as aforesaid, were made for the purpose of defrauding and cheating this plaintiff, and of inducing him to make and enter into said exchange, as aforesaid, and to induce him to deliver to the said defendants E. P. Smith and Glenn Newton the difference between the represented incumbrance on the Yolo County property and the actual incumbrance on said property, to-wit, the sum of $1000.00, and that said representations so made as aforesaid were and are false, fraudulent and untrue, and were known by said defendants and each of said defendants at said time, and at all times to be false, fraudulent and untrue.

## "XIII

"That in truth and in fact there was a note secured by a deed of trust constituting a first lien on the lands of Thos. E. Garner in Yolo County in no greater sum than $2000.00, and that said note and deed of trust were held by Mary A. Bostwick of Sacramento, and that no more than $2000.00 was due upon said note so secured by deed of trust at any time.

"That there was not and never was a note secured by a deed of trust, or other writing, constituting a lien on the said lands of Thos. E. Garner, in Yolo County, in the sum of $3000.00, or any other sum greater than $2000.00. That the exchange price of the lands of Thos. E. Garner in Yolo County, as aforesaid, in truth and in fact was the Yolo County lands and the assumption of the said note secured by a deed of trust to Mary A. Bostwick in the sum of $2000.00, and no more.

"XIV

"That the said defendants Glenn Newton and E. P. Smith at all times concealed from this plaintiff the true trading price of the said lands of Thos. E. Garner in Yolo County, and that the said defendants at all times kept and concealed from this plaintiff the certificate of search prepared by the Yolo County Title Abstract Company, a corporation, and also concealed from this plaintiff the policy of title insurance placed on the said Yolo county property of Thos. E. Garner, and that the said defendants, and each of them, at all times concealed from said plaintiff the fact that the note secured by a trust deed to Mary A. Bostwick was no greater than the sum of $2000.00.

"XV

"That this plaintiff did not know or ascertain the falsity of said representations, and the fact of concealment as aforesaid by the said defendants, until the last of May, 1925.

"XVI

"That the plaintiff believed and relied on the said representations of said defendants as aforesaid, and upon each and all of said representations, and believed and trusted the said defendants, and each of them, and that so believing and trusting the said defendants, and each of them, and the said representations made by them, and each of them, plaintiff and the said Thos. E. Garner made the said exchange as aforesaid, and that plaintiff by deed of conveyance executed and delivered on the 11th day of May, 1925, conveyed to the said Thos. E. Garner, his real estate heretofore mentioned and situated in the County of Alameda, State of California, and that the said Thos. E. Garner in a deed of conveyance joined in by his wife, deeded to this plaintiff the said Yolo County lands above mentioned and described by deed of conveyance delivered the 11th day of May, 1925.

## "XVII

"That on the consummation of said exchange 'the said defendants, Glenn Newton and E. P. Smith, and each of them, were paid a broker's commission for making said exchange.

## "XVIII

"That at the time the said deeds were made and executed between the said plaintiff and the said Thos. E. Garner, the said defendants E. P. Smith and Glenn Newton, and each of them, stated and represented that it was necessary for this plaintiff to execute a new note and deed of trust in the sum of $3000.00 to the beneficiary, and that the said defendants drew up and presented to this plaintiff for his execution a note and deed of trust in the sum of $3000.00 in favor of the said Mary A. Bostwick, which said note and deed of trust the said defendants and each of them, stated and represented to plaintiff was to take the place of the note and deed of trust in the sum of $3000.00 theretofore constituting a first lien upon the said property of Thos. E. Garner; whereas, in truth and in fact the said note and deed of trust should have been executed for the sum of $2000.00 only.

"That this plaintiff believing and relying upon said statement executed said note and deed of trust for $3000.00 and delivered the same to said E. P. Smith and Glenn Newton, and each of them, for their delivery to the said Mary A. Bostwick. That said new deed of trust was executed and delivered on the 11th day of May, 1925.

## "XIX

"That the said defendants and each of them, thereupon had the said Mary A. Bostwick assign said note and deed of trust to one L. T. Allee, who thereupon gave to the said Mary A. Bostwick the sum due her on her former note and deed of trust, to-wit, the sum of $2000.00, and that the said L. T. Allee paid to the said Mary A. Bostwick the whole amount due on said $2000.00 note secured by a deed of trust, and took an assignment of the said new note for $3000.00, secured by said new deed of trust.

## "XX

"That the said L. T. Allee thereafter on the 19th day of June, 1925, paid to the said defendant, E. P. Smith, the sum of $1000.00, being the difference between the amount due

the said Mary A. Bostwick on her note for $2000.00, secured by the deed of trust that constituted a first lien upon the lands of Thos. E. Garner at the time the negotiations and exchange were made, and the sum called for in the new note and deed of trust so executed by plaintiff as aforesaid.

"XXI

"That the said sum of $1000.00 so paid by the said L. T. Allee, to the said E. P. Smith was not a commission for making the said exchange, and that said sum was not a part of the exchange price paid by plaintiff to the said Thos. E. Garner, and that the said note and deed of trust in the sum of $3000.00 which was executed by plaintiff to the said Mary A. Bostwick, and which was by her assigned to the said L. T. Allee, is now a first lien upon the properties of this plaintiff so taken in exchange by him from the said Thos. E. Garner, as aforesaid.

"XXII

"That plaintiff is informed and believes and therefore alleges that the said sum of $1000.00 so received by the said E. P. Smith as aforesaid, was divided by the said defendants, E. P. Smith and Glenn Newton in proportions unknown to this plaintiff.

"XXIII

"That by reason of the said false and fraudulent representations and concealment of the said defendants, Glenn Newton and E. P. Smith, as aforesaid, this plaintiff has been cheated and defrauded out of the said sum of $1000.00, together with interest thereon from the 11th day of May, 1925, to the date of judgment, all to plaintiff's damage in the sum of $1000.00, as aforesaid."

The complaint also sets forth allegations relative to the execution of bonds by the respective indemnity companies to insure the faithful performance by the defendants, Smith and Newton, of their duties as real estate brokers, and compliance with the act of the legislature of the state of California providing for the licensing and bonding of real estate dealers, each of the defendant companies executing a bond in the sum of $2,000. The answers of both of the appellant companies deny all of the material allegations of the complaint, but the fact of there being only a $2,000 lien on the Garner property is denied only upon information and belief, and as the trust deed securing the payment

of the lien thereon was a public record, and showed upon its face that it secured only the payment of $2,000, the answers of the appellants admit the existence of the lien of only $2,000 and what the public record exhibited, and raises an issue only as to the representations of a lien against the Garner property in the sum of $3,000 and the concealment by the defendants Smith and Newton of the fact that the trust deed was for no greater sum than $2,000. As stated in 21 California Jurisprudence, page 150, section 101: "It is settled that the existence of an alleged fact which may readily be ascertained from an inspection of a public record, within the reach of a defendant may not be put in issue by a denial based solely on information and belief." The defendant Newton made default, and his liability is not considered herein further than it is necessary to review the testimony to ascertain if there is sufficient in the record to support the judgment against the Globe Indemnity Company. In this particular it may be stated at the outset that a reading of the record shows very clearly that much more testimony might have been introduced relative to the actions of the defendant Glenn Newton, in relation to the issues involved, had not the respondent labored under the mistaken idea that the default of Newton could be considered in this case as evidence against his surety, Globe Indemnity Company. The law in relation to this question will be considered later on. As to the sufficiency of the testimony to sustain the judgment against E. P. Smith and his surety, the Hartford Accident and Indemnity Company, an affirmative answer appears to be amply supported. The real question is as to whether there is sufficient in the record to support the judgment against Newton and his surety, not considering Newton's default.

In order to support the judgments in this case as against the appellants, it must appear from the record that the defendants E. P. Smith and Glenn Newton acted jointly or co-operated in inducing the plaintiff to execute a trust deed in the sum of $3,000, whereas, in truth and in fact, it should have been executed only for the sum of $2,000. The appellants here advance the argument that as McPhetridge was willing to execute a trust deed in the sum of $3,000 in the exchange of the properties, he obtained just what he bargained for, and, therefore, was uninjured. This, of

course, overlooks entirely the law relative to the duty of an agent to act honestly toward his principal and inform him of every fact material to the advantage of the principal. Nor does it matter whether Newton or Smith benefited by the proceeds of the fraud. While not made a defendant in this action, in order to understand the situation it is necessary to set forth and consider the acts of Howard Kerr, the agent for Thos. E. Garner, the owner of the real estate in Yolo County. This, for the purpose of showing that Kerr, Newton and Smith co-operated in securing an extra $1,000, to the intent and purpose that all three of the agents might in some manner obtain compensation. The liability of Kerr to Garner to answer for the fact that the plaintiff was paying his principal $1,000 more than his principal had knowledge of is not in issue here, and is not passed upon, but the testimony in relation thereto is set forth simply to show how the three agents co-operated. While not in the order as it appears in the transcript, we will begin with the testimony of T. E. Garner, and the acts which characterize what we will call the moral status of the transaction from the very beginning. Mr. Garner testified as follows:

"I formerly lived in Yolo County where I owned 820 acres of land; I traded my property with plaintiff; the exchange was made through Howard Kerr, a real estate agent of Sacramento, acting for me; Newton handled the transfer for McPhetridge; at this time my property in Yolo had a $2000.00 mortgage (the trust deed was called a mortgage by most of the witnesses); I went to Oakland with Mr. Kerr, examined the property, looked at the records in the recorder's office and came to Sacramento to close the deal with Mr. Kerr; I signed a written agreement that provided I was to exchange my ranch in Yolo County subject to a $2000.00 mortgage, for the McPhetridge property in Oakland subject to a $6000.00 mortgage; I placed the property in the hands of Mr. Kerr to sell, and after several months' time he came over to my place in Capay Valley and asked me how I would exchange; he said he had a party who wanted to trade for some land; I told him I didn't know; we made an appointment to go down and look over the Oakland property; when I got down there they represented the property in Oakland as having an $8000.00 mortgage on it, which they wanted to exchange for my place; by 'they' I mean

Mr. Kerr and Mr. Newton; he was the man that handled the McPhetridge side of the case; I went to look the property up and found that there was only $6000.00 against the property, and this $2000.00 was to be put on it for some other purpose; they represented to me the $2000.00 was to go on there as they would have to have $2000.00 more; by 'they' I mean Mr. Newton and Mr. Kerr; when I found that they were asking $8000.00 on the place, I took the train and went home, and Mr. Kerr came over and wanted to know what kind of a trade I would make; I told him what I would do, and that was all; I would just exchange the properties as they stood; of course I was to pay him a commission; there was a mortgage of $2000.00 against my property; the exchange agreement that I signed provided to exchange my ranch in Capay Valley subject to a $2000.00 mortgage, for the Oakland property subject to a $6000.00 mortgage; Mr. Newton said that the Oakland property would have to be increased to $8000.00; that Mr. McPhetridge wanted this money to pay bills, or something; that is the way he represented the trade; I had nothing to do with that proposition.'' This witness testified that after the exchange had been made, in conversation with the plaintiff he told the plaintiff that the lien on the Yolo County property was for $2,000 only, whereupon the plaintiff replied that he had given a $3,000 trust deed, as he was told that that was the amount of the trust deed to be placed on the property. It may be here stated that the record does not show that the holder of the $2,000 note, for which Garner had executed a trust deed as security on the Yolo property, had made any demand for payment, nor does the record disclose that Mrs. Bostwick, to whom the original $2,000 note was given, and to secure which the trust deed was executed by Garner, had any knowledge of why a new trust deed was executed in place of the $2,000 one. The whole transaction appears to have been carried through and the negotiations had for the sale of the $3,000 trust deed in order to secure the $1,000 which the complaint alleges was wrongfully obtained. The reasons for boosting the lien on the Yolo County property in the sum of $1,000 was an entirely silent transaction so far as the beneficiary under the original trust deed was concerned, and likewise as to both the plaintiff and Garner, the owners of the

properties being exchanged. The plaintiff testified at considerable length, and we take from the testimony the following excerpts: "I now live in Yolo County; I formerly lived in Oakland; I own some property in Oakland; I accompanied Mr. Newton and Mr. Smith to see the Garner property that was subsequently deeded to me; I had business dealings with Smith and Newton in April and May, 1925; these men, Smith and Newton, came to me one afternoon in Oakland and they said they had a trade for me; they wanted me to get in a machine and come up and look at the property; we were to meet Mr. Kerr of Sacramento at Madison; it was known as the Garner property; I signed an escrow agreement delivered to the Central Title Company of Oakland, California, agreeing to convey my property subject to a $6000.00 mortgage, for the Garner property, to include about 840 acres, subject to a $3000.00 incumbrance; I agreed to pay Newton $1000.00 if he made an even exchange of the properties. Mr. Newton said the property in Yolo County had a $3000.00 incumbrance; I did not examine the title to the Yolo property prior to the exchange of deeds; about five or six days after the deal was closed Mr. Garner told me the Yolo property was mortgaged for only $2000.00; I paid Newton $700.00 commissions; after Mr. Smith and Mr. Newton and myself visited the Garner property, Mr. Newton and I returned to Oakland and there I signed the agreement to pay $1000.00; after I told Newton I would pay him $1000.00 if he made an even exchange, he said he would see what he could do, and within a few days he came out to see me and said there was a $3000.00 mortgage against the Yolo place, and that was the best he could do; I said I would trade; each was to assume the other's mortgage; Mr. Newton said he would cut down his commissions to $700.00; I never saw an abstract to the Yolo property; I got a title insurance; I was in the Abstract Company's office at the time the deal was closed; Mr. Smith and Mr. Newton were there also; it was in the office of the Central Abstract Company in Oakland where I signed the papers; after the deal was closed the papers concerning the title to the Garner property were returned to me, if I remember rightly; the deal was finally consummated at Oakland at the office of the Central Abstract Company; I did not inquire as to how the title

stood; I signed a note and trust deed for $3000.00 and the exchange was made; it was in accordance with the agreement or instructions to the Title Company; I did not look at the title report that had been prepared by the Yolo County Title Abstract Company concerning the title to the property I was to acquire. In regard to the title, I had this conversation with Mr. Newton; I told Newton I had never done but very little business, and said I should get a lawyer to attend to this, and he said, 'I have known you for a long time and you have treated me fair and I will see that you get a square deal in this case'; I knew they were making a search; they said the title was going through but I did not see the papers; they said that they were getting the abstract and to deliver a deed to the property; I never came up to Woodland to examine the records as to how the title stood; I left it all to Mr. Newton; Mr. Newton said there were 840 acres, and finally got down to 820; Mr. Newton told me that the papers were being prepared in Woodland; the abstract was being made here in Woodland; I didn't get the papers until after the deal was closed; I left that up to Mr. Newton, as he told me he was a friend of mine and he would attend to all these matters and save me hiring an attorney, and so I left it up to him and he did the work; Mr. Newton told me that the preliminary report did not show the correct number of acres; he said that instead of 140 acres it was either 118½ or 120—I mean 820 instead of 840, as he told me first; I only mentioned incumbrance on the property at the time he told me; that was before the transaction started—that there was a $3000.00 mortgage, and that was all that was said; I didn't know anything about the $2000.00 incumbrance until after it was all over; Mr. Newton and I came up from Oakland and met Mr. Smith in Sacramento, and we went out to look at the property; they said he and Newton were working together. Q. And Mr. Newton was working for you, and Mr. Smith was representing the seller of the country property, is that correct? A. I presume so, yes, sir. Q. And that is the same situation that existed in this deal, wasn't it? A. No; I couldn't answer that question because I don't know, because they both seemed to officiate in this matter and Mr. Smith was there Johnnie on the spot when this deal was put through.

Mr. Newton told me that he split the commission three ways; I said to him: 'You didn't make much out of this deal, did you?' He answered: 'No, I split the commission with Mr. Kerr and Mr. Smith.' "

The defendant E. P. Smith was called as a witness, and from his testimony we set forth the following: "I had a conversation with Mr. Newton about the exchange of the McPhetridge and Garner properties; on the day Mr. McPhetridge, Mr. Newton and myself came to view the Yolo property I phoned to Mr. Howard Kerr of Sacramento asking him to meet us at Madison. Mr. Kerr was paid a commission on the deal; I don't know how much; I didn't make any arrangement about the title to the Yolo property nor record the deeds; I was entrusted with some papers to deliver to the Yolo Title and Abstract Company but I don't know what the documents were." Witness was shown a check for $900 and stated that he received that sum from the trust deed heretofore referred to as the $3,000 trust deed, and that the $3,000 trust deed was sold to a man by the name of Allee for $3,000; that he kept $900 as his own profit and gave Mr. Allee $100 for buying the paper; that Mr. Kerr told him there was a $2,000 trust deed on the Garner property, but he did not remember whether Kerr told him that prior to, or during the negotiations or afterward; that he possibly knew about the encumbrance before the deal was closed; that he was not negotiating for the sale of the property, but that he was trying to bring the parties together; that he was not working for Howard Kerr, that he was working for himself; that he did not know anything about the exchange price; "I possibly heard some figures mentioned," but that the exchange prices were usually matched to fit specific cases; that he had a conversation with Mr. Newton about the exchange of the two properties; that he and Newton and McPhetridge went out to look at the Yolo property; that he, the witness, expected to participate in the deal; that he brought some papers which were entrusted to him by the Central Title Company of Oakland and turned them over to the Yolo County Title Abstract Company, and they recorded them; that he brought up the trust deed, the one which Mr. McPhetridge signed; that he did not read

the trust deed and could not say that it was for $3,000; that Mr. Kerr told him that there was a $2,000 trust deed on the property. The witness further testified he was trying to bring the parties together; that Mr. Newton rang him up on the phone and said: "There is an offer in escrow to trade McPhetridge's property on Flint Street subject to a lease and subject to a trust deed for the Yolo County property, subject to $3000.00, and McPhetridge agrees to sign a trust deed for $3000.00." "Q. You had talked it over prior to that time? A. Certainly; I brought the parties together with the expectation of getting some remuneration. Q. You expected to get your remuneration by increasing that trust deed didn't you? A. No, sir. Q. Where did you expect to get your remuneration? A. Commission. Q. From whom? A. Mr. Kerr and Mr. Newton; I asked them both." The witness further testified, after stating that he expected to participate in the deal: "Q. Well, whom were you representing? A. I was a broker; nobody employed me; I employed myself; that is my business. Q. In just plain language, you butted into the deal, is that the idea? A. Do you butt into a deal when a man brings you a case? Q. I am asking you? A. I have got a broker's license. Q. (In relation to the $2000.00) Then you knew it before the deal was closed, didn't you? A. I didn't say I didn't. Q. You did know it? A. Possibly I did; I didn't say I did, but possibly I did. Q. Did you ever tell Mr. Newton that there was a $2000.00 mortgage or deed of trust on the Garner property? A. Not to my knowledge. Q. Did you ever tell him that there was a $3000.00 trust deed or mortgage on the property? A. I didn't. Q. Never told him that? A. No. Q. You are negotiating a sale of this property? A. I wasn't negotiating anything. Q. You were trying to put the deal through? A. I was bringing two parties together. Q. You were bringing two parties together? A. Yes. Q. And trying to raise $900.00, yet you never told him the purchase price? A. That's right, I never quoted the purchase price to anyone." The witness Smith further stated that he sent a telegram to Glenn Newton about this deal. The telegram was then handed to the witness, and it reads as follows:

"Sacramento, Cal., May 18, 1925.

"Glenn Newton,

"3450 Woodruff Ave.,

"Oakland, Cal.

"Kerr sent title for McPhetridge to see some days ago. Must have return of same before Huston will give up $900.00. Rush on this. Have another deal ready for you. Call me on phone at once or get action on that policy so we can close.

"Signed, E. P. SMITH."

This telegram, of course, was sent after the exchange of properties had been had, but it shows when the title policy was sent to Mr. McPhetridge, and so far as the transcript on appeal shows, was admitted without objection, and left the court at liberty to draw the conclusion that the $900 referred to in the telegram was the $900 which Smith was to get as his part of the commissions for bringing the parties together, and that Glenn Newton knew all the circumstances and would hasten the return of the paper called for so that Mr. Smith might get what he called his remuneration for participating in the deal, and also justifies the conclusion of the trial court that Mr. Newton knew of the difference between the actual lien upon the Garner property in the sum of $2,000 and the sum at which he represented such lien against the Garner property which, as we have heretofore shown, Newton stated to the plaintiff to be $3,000, which brings home to the defendant Newton actual knowledge of the encumbrance which was upon the property, different from what he stated to the plaintiff. The duty of the agent is to inform his principal of the actual facts concerning the transaction. From what we have said it is evident that Newton did nothing of the kind, although the short excerpts from the testimony establish his knowledge, and further show that he laid the foundation by lulling the plaintiff into security, telling him that it was not necessary to employ a lawyer, that he, Newton, was the plaintiff's friend and would see that he got a square deal.

The defendant Smith was placed upon the witness-stand in his own behalf and proceeded to tell the story as to Mr. Kerr informing him how his profit might be secured by negotiating a sale of the $3,000 trust deed and paying Mrs.

Bostwick the amount of her $2,000 note. This testimony does not specially involve Mr. Newton, but is illuminating in the fact that the $2,000 trust deed appears to have been satisfied or canceled and the $3,000 trust deed transferred to Mr. Allee for the sum of $3,000, Mrs. Bostwick paid the amount actually due her and the remainder distributed as we have here said, all without the knowledge of Mrs. Bostwick. The cross-examination of Mr. Smith, when placed upon the witness-stand in his own behalf, shows that Mr. Newton had the preliminary report of the Garner property in his possession.

The record which we have set forth discloses that Kerr and Newton failed in their attempt to get $2,000 in the first instance by boosting the mortgage on the McPhetridge property situated in Oakland, but that by boosting the trust deed on the Garner property in Yolo County, in addition to there being paid to Newton the sum of $700 and $400 to Mr. Kerr, Mr. Smith was enabled to clean up a profit of $900 and give Mr. Allee a bonus of $100 for buying the trust deed.

█ The fact that Mr. E. P. Smith may have been a volunteer or a gratuitous agent in the inception of the transactions to which we have referred, or even during the course of the progress of the negotiations, is wholly immaterial. This is abundantly shown by the rule cited in 1 California Jurisprudence, page 790, paragraph 79, to wit: "While a gratuitous agent cannot be compelled to enter upon performance of an agency, nor be mulcted in damages for his failure to do so, when he does enter upon such performance he is, in common with all other agents, bound to exercise the utmost good faith in dealing with his principal . . . An agent for hire is bound to exercise a greater degree of care and diligence than an agent acting gratuitously, but the latter has no greater license to indulge in misrepresentations, concealments or other breaches of good faith than the former . . . Even a gratuitous agent is therefore liable to his principal for damages resulting from a gross neglect of duty which he owes to his superior." And as further said in the same volume, page 805, section 91: "In entering upon the relation of principal and agent, the principal bargains for the exercise of the skill, ability and industry of his agent, and the agent agrees that he has reasonable

skill and will do the work with reasonable care." A number of authorities are cited to support the language of the text. ■ Again, as said in the case of *Revert* v. *Hesse*, 184 Cal. 295 [193 Pac. 943, 946] : "It is a general and well-settled principle of law that where two or more persons are sued for a civil wrong, it is a civil wrong resulting in damages and not the conspiracy which constitutes the cause of action. (Citing *Herron* v. *Hughes*, 25 Cal. 555; *Davitt* v. *Bakers' Union*, 124 Cal. 99 [56 Pac. 775] ; *Dowdell* v. *Carpy*, 129 Cal. 168 [61 Pac. 948] ; *Menner* v. *Slater*, 148 Cal. 284 [83 Pac. 35].) ■ In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tort-feasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity. (*Cohen* v. *Fisher*, 135 App. Div. 238 [120 N. Y. Supp. 546] ; *White* v. *White*, 132 Wis. 121 [111 N. W. 1116] ; *Miller* v. *John*, 208 Ill. 173 [70 N. E. 27].) ■ A plaintiff is entitled to a joint recovery of damages against such defendants as he can show have united or co-operated in inflicting a wrong upon him. (*Herron* v. *Hughes*, *supra; More* v. *Finger*, 128 Cal. 313 [60 Pac. 933] ; *Nevin* v. *Gary*, 12 Cal. App. 1 [106 Pac. 422].) " ■ And further, as said in 2 C. J., page 714, section 369 : "Loyalty to his principal's interest requires that an agent shall make known to his principal every material fact concerning his transactions and the subject matter of his agency that comes to his knowledge or is in his memory in the course of his agency, and if he fails to do so, he is liable in damages to his principal for any injury incurred or loss suffered in consequence of such failure."

■ The court found that the defendants, E. P. Smith and Glenn Newton, at all times mentioned, conspired and operated, worked and schemed together to cheat and defraud plaintiff, and that the said defendants and each of them acted in union, concert and collusion in the making of false representations, and each of them acted as in said complaint alleged for the express purpose of cheating the plaintiff out of the sum of $1,000 as aforesaid. The appellants urge that the complaint does not in specific terms allege a conspiracy, and that the trial court so stated during

the course of the trial. While this is true, the complaint does, nevertheless, set forth all the facts necessary to constitute a charge of conspiracy. That this was not considered by the trial court until it came to making its findings does not militate against the correctness of the findings. In 12 C. J., page 630, section 216, in dealing with the subject of pleadings having to do with conspiracies, we find the following: "In an action of the nature under consideration the rule is to allow great latitude in setting out in the complaint the particular acts from which the conspiracy is to be inferred; even going so far as to allow the individual acts of the conspirators to be averred. The act complained of, however, must be definitely and issuably stated, so that, if the facts themselves should be admitted, the court can draw legal conclusions. And so the opposite party will be apprised of what he is called on to answer." The complaint under consideration responds fully to all these requirements. The facts and acts of the parties are fully set forth. That the word "conspiracy" was not used in nowise lessens the legal import of the acts nor if the word "conspiracy" had been used would it have added anything to the legal significance of what was done and performed or the concealments indulged in by the defendants Smith and Newton. In 5 California Jurisprudence, page 530, section 30, this language is found, supported by abundant authorities: "In an action for damages resulting from acts of conspirators, the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tort-feasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity. And so, a plaintiff is entitled to a joint recovery of damages against such defendants as he can show have united or co-operated in inflicting a wrong upon him." There can be no question from the facts which we have set forth that the defendants Smith and Newton co-operated in inflicting the injury alleged upon the plaintiff in this action. And likewise, in the same volume on page 533, section 34, a reading of the text, supported by authorities, shows that if the facts are set forth constituting a conspiracy, it is unnecessary to use the term "conspiracy."

That a concealment of the true amount of the lien

upon the Garner property, and the representation that it was $1,000 in excess of the true amount, constituted a fraud, requires no argument. ■ The record in the case from which we have quoted shows that the plaintiff relied upon the statement made by Newton that he, Newton, would see that the plaintiff would get a square deal, which, of course, carries with it the implication that he, the plaintiff, would not be defrauded out of $1,000 by any of the representations made to him by the defendant Newton, irrespective of the acts of the defendant Smith. We do not need to go further into the law relative to the duty of agents to disclose to their principals every fact within their knowledge affecting the financial interests of their principals, nor is it material whether any particular agent profited by his misrepresentations or concealments. (26 C. J. 1180; *Von Schrader* v. *Milton,* 96 Cal. App. 192 [273 Pac. 1074].) In this case the trial court would have been warranted in concluding that the defendant Newton profited by the concealments, as his co-worker, by reason of the misrepresentations and concealments, was enabled to enrich himself to the extent of $900, and thus Newton was saved from splitting his fee with Smith; or it may be that this is what Newton considered splitting his fee with Smith, as he stated to the plaintiff he had done.

■ Finally, it is argued that the court erred in overruling the appellants' demurrers on the ground of misjoinder of actions, and that there should be a reversal for such alleged error. The respondent replies that section 379a of the Code of Civil Procedure answers this objection. That section reads: "All persons may be joined as defendants against whom the right of any relief is alleged to exist, whether jointly, severally or in the alternative, and judgment may be given against such one or more of the defendants as may be found to be liable, according to their respective liabilities." The appellants rejoin to the answer of the respondent that this section did not become a part of the Code of Civil Procedure until after the trial of this action. This contention is true, but section 4½ of article VI of the Constitution provides that no new trial shall be granted for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the

court shall be of the opinion that the error complained of has resulted in a miscarriage of justice. The procedure followed by the court is precisely the procedure now outlined in the section of the code just referred to, and if the procedure which was followed by the court constitutes a miscarriage of justice, then and in that case section 379a of the Code of Civil Procedure is unconstitutional, as providing a procedure which contemplates a miscarriage of justice. No such argument is presented by appellants. It is evident that section 379a, *supra,* is just simply a legislative expression of what is covered by section 4½ of article VI of the Constitution, and that if it is now a proper procedure and affords parties ample opportunity to be heard, then and in that case it did not in this trial result in a miscarriage of justice. An examination of the record, however, shows that the appellants had every opportunity to present their cause; that there was no testimony introduced upon the trial of the action, or at least none has been called to our attention, that would not have been admissible had the defendants all been sued separately.

█ While the testimony in this case discloses that the defendants Smith and Newton did not indulge in any extended conversation relative to their acts, it does show that they both understood and acted with a common purpose. █ The fact that persons engaged in unlawful and fraudulent enterprises talk but little, but act with a common understanding, has led to the rule that fraudulent designs and conspiracies may be established without what is called any direct proof.

█ We think what we have stated discloses sufficient to justify the trial court in drawing every material conclusion reached by it. Objection is made that some of the immaterial findings of the court are not supported by the testimony, but as the material facts and issues are all sufficiently supported, such objections, if correct, would not warrant a reversal of the judgment. █ That the default judgment against the defendant in a case similar to this cannot be considered as proof against his bondsmen, needs but little consideration. The law appears to be well settled in this state that sureties are not bound by judgments against their principal unless the undertaking so provides, as where one undertakes to pay a certain sum in the event of the prin-

cipal failing so to do. In other cases the surety is not prevented from making any defense that might have been interposed by his principal. (See Stearns on Suretyship, 3d ed., p. 298; 23 Cal. Jur., p. 1062; *Easton* v. *Boston Investment Co.*, 51 Cal. App. 246 [196 Pac. 796].) Other cases might be cited, but the rule announced in the citations given prevails in California.

The judgment against all the defendants, as entered by the trial court, is affirmed.

Thompson (R. L.), J., and Finch, P. J., concurred.

[Crim. No. 1096. Third Appellate District.—October 7, 1929.]