[Civ. No. 2839. Fourth Dist. Aug. 3, 1942.]

J. R. RAMSEY, Respondent, v. WILLARD W. PENRY et al., Defendants; W. WEST HUNT et al., Appellants.

Whitelaw & Whitelaw and Russell Yaeger for Appellants.

Wirt Francis and Paul Worland for Respondent.

MARKS, J.—This is an appeal by W. West Hunt and Harold W. Hunt from a judgment against them and James Ebert for $3,750, in an action for damages for fraud which

was alleged to have grown out of an attempt to sell the stock of a corporation. Ebert has not appealed.

George H. Woods was the inventor of a patented tool which had as its purpose the renovation of soil. On June 14, 1938, plaintiff and Woods entered into a contract whereby Woods granted plaintiff the right to purchase these soil renovators and the exclusive right to operate them throughout California except in the county of Ventura. The purchase price was fixed at 40 per cent above cost. Plaintiff obligated himself to order, pay for and accept deliveries of at least five of the soil renovators on or before June 30, 1939.

Plaintiff caused a corporation to be organized named the California Soil Sterilizing Corporation, Woods' Process, which we will call the corporation. He assigned his contract with Woods to this corporation on July 1, 1938.

Under date of July 7, 1938, the Commissioner of Corporations issued a permit for the corporation to sell not more than 37,500 shares of its stock for its par value of $1.00 per share and to pay a licensed broker or agent not to exceed 20 per cent of the selling price. Plaintiff was to receive one share of stock for each share sold for cash, his stock to be placed in escrow with an agreement waiving his right to participate in any distribution of assets of the corporation, "excepting dividends payable according to law," until the subscribers for stock (purchased for cash) should receive the return of the full amount of the purchase price. No certificates were to be delivered and no money paid to the corporation until $15,000, to be received from the sale of stock for cash, had been deposited with an escrow holder. By amendments to the permit the time to conform to its terms was fixed as of January 6, 1940.

Willard W. Penry and Verree A. Mason were licensed brokers doing business under the name of Penry & Mason. By an instrument bearing date June 18, 1938, Penry & Mason was appointed underwriter to distribute 37,500 shares of stock to the general public. There is nothing to indicate that this agency was exclusive or that the corporation could not employ other brokers or agents satisfactory to the Commissioner of Corporations to sell its stock.

James Ebert was a salesman employed by Penry & Mason to whom was delegated the duty of selling the stock. Only 2980 shares were sold. The selling campaign started on August 4, 1938.

W. West Hunt and Harold W. Hunt were brothers doing

business in Imperial Valley under the firm name of Hunt Brothers. W. West Hunt subscribed and paid for 500 shares of stock and Harold W. Hunt subscribed and paid for 200 shares and took an option to purchase 4800 additional shares.

The first board of directors of the company was composed of J. R. Ramsey, who was president and acted as general manager, H. E. Trumbell and L. J. Penry. On September 28, 1938, Penry resigned and Harold W. Hunt took his place. As far as we are advised there was no other change in the membership of the board during the time involved here.

Prior to the incorporation of the company a soil renovator had been built and used for experimental purposes. This was destroyed by fire. A second was built which was also burned. A third machine was built by Hunt Brothers which was used for experimental purposes in Imperial Valley, and near Shafter in Kern County. None of the machines were built by Woods and none were ordered by the company from Woods.

Under date of November 15, 1938, Penry & Mason assigned to James Ebert the contract to sell the stock of the company. At that time Hunt Brothers paid Ebert $1,500. He in turn paid Penry & Mason $700 for the assignment, retaining the balance for his own use.

The purchase of the stock-selling contract was made pursuant to the terms of a contract between Ebert and Hunt Brothers, dated November 14, 1938, which contemplated it. In consideration of the payment of the $1,500, Ebert agreed to pay Hunt Brothers a variable percentage of the commissions to become due him for the sale of stock.

The evidence indicates that Hunt Brothers paid Ebert and Woods about $100 per month each as living expenses. We are not able to determine just when these payments were started.

There was little stock sold during the fall of 1938 and thereafter. Ramsey testified that in response to his inquiries, Ebert told him that such sales could not be made until the results of experiments made with the soil renovator in Imperial Valley became apparent; that the value of the renovator could not be determined until the crops planted on land renovated had matured. Ramsey further testified that during the last of February, 1939, Ebert told him there had been no attempt to sell stock for two and one-half months; that Hunt Brothers did not want any stock sold.

Under date of March 20, 1939, Woods and Ebert entered

into a contract whereby Ebert was given the right to use the soil renovator in Ventura County. He agreed to purchase one machine from Woods at 40 per cent above the cost of manufacture.

Under date of July 1, 1939, Woods served a written notice of cancellation of the contract of June 14, 1938, because of the failure to purchase five soil renovators before June 30, 1939. A copy of this notice was served on the Commissioner of Corporations.

On November 24, 1939, Woods, Ebert, Harold W. and W. West Hunt entered into a contract concerning the soil renovator. This contract provided for the adjustment of certain outstanding rights to use the soil renovator, and interests in the patent, some of which were created by contracts which we do not find in the record. It provided for the formation of a corporation and the assignment of the patents to it; for division of the interests of the parties so that Woods would have 32½ per cent and each of the other three 22½ per cent, subject to certain small deductions. It was also agreed that a money judgment against Woods be paid and that Woods and Ebert each receive $100 per month. The money to pay the judgment was furnished by Hunt Brothers.

The trial court entered judgment in favor of Penry & Mason, and in favor of plaintiff, and against Ebert and W. West and Harold W. Hunt for $7,500. This judgment was based on findings of conspiracy between Ebert and the two Hunts which damaged plaintiff in destroying the value of his interest in the corporation; that such interest has "been rendered of no value, and plaintiff has suffered damage in the sum of Seventy-five Hundred Dollars ($7500.00)" without any other finding of the value of such interest.

A motion for new trial was made. One finding was modified and new findings were made which completely changed the theory of the case. The reasons for this are stated in an opinion filed by the·trial judge in which the following appears:

"Damages were allowed at the original trial upon the theory that plaintiff had been deprived of 7,500 shares of stock of the par value of $1.00 a share, and was damaged accordingly under the rule stated in *Victor* [Oil Co.] v. *Drum*, 184 Cal. 226 [193 Pac. 243], and *Dicker* v. *Italo-American Oil Corporation*, 119 Cal. App. 451 [6 P. (2d) 550].

"However, upon further consideration, on the motion for new trial herein, we are of the opinion that plaintiff's dam-

age is more properly measured by his loss of time and money in his efforts to promote the enterprise, which the acts of the defendant have cut off. What profits plaintiff might have made are speculative and uncertain. The loss of time and money is both definite and certain, and we have found it to be $3,750.00.''

In the new findings is the following:

''That at all times between September 28th, 1938, and July 1, 1939, plaintiff and defendants James Ebert, Harold W. Hunt and W. West Hunt were joint adventurers associated together for the purpose of promoting the development through a corporation of the contract rights to U. S. Patent #2008891 as set out in the contract of June 14, 1938, by and between plaintiff and George H. Woods . . .

''Plaintiff was damaged to the extent of $3,750.00 for time and money spent in promoting said contract rights to patent #2008891, which contract rights were made valuless to plaintiff by the acts of defendants Hunt Brothers and Ebert heretofore.''

This is the first time that the question of a joint adventure was expressly injected into the case. Appellants urge that there are no allegations in the complaint of a joint adventure to support the new findings; that no right to amend was asked or given; that the findings of joint adventure are entirely without the issues made by the pleadings and unsupported by the evidence.

We do not consider it necessary to decide these questions. For the purpose of this opinion we will assume without holding that the complaint states a cause of action; that sufficient ultimate facts were alleged to support the finding of joint adventure; that the evidence supports the finding of joint adventure and conspiracy on the part of Ebert and the two Hunts. We will confine our consideration to the question of damages alleged and proved.

There were no special damages alleged in the complaint. There is only the allegation of general damage in the sum of $100,000.

Evidence concerning the time and money expended in attempting to promote the affairs of the corporation was received over the strenuous objections of appellants. Special damages must be alleged or they cannot be recovered. (*County of San Mateo* v. *Christen*, 22 Cal. App. (2d) 375 [71 P. (2d) 88].) Money spent in promoting the organization of a corporation to which certain contracts were to be assigned, has

been held to constitute special damages that must be specially alleged in an action quite similar in principle to the instant case. (*Duell* v. *Sanstrom,* 120 Cal. App. 414 [7 P. (2d) 1087].)

Damages for breach of an obligation arising from contract is an amount that will compensate the party aggrieved for all detriment proximately caused thereby. (§ 3300, Civ. Code.) The damages for a wrong not arising from contract should be an amount that will compensate the aggrieved party for all detriment proximately caused thereby. (§ 3333, Civ. Code.) It is also established that speculative damages may not be recovered. (*Taylor* v. *Hopper,* 207 Cal. 102 [276 Pac. 990]; *Houghton* v. *Lawton,* 63 Cal. App. 218 [218 Pac. 475]; *McGregor* v. *Wright,* 117 Cal. App. 186 [3 P. (2d) 624].)

In considering the measure of damages applied here we must observe that plaintiff had no agreement with any one for repayment of any money spent by him in organization expenses or promotion of sales of stock in the corporation. Nor was he to be compensated for time spent in those activities by payment of anything for those services. The only way in which plaintiff could have been compensated for those expenditures of time and money was by receiving the stock placed in escrow for him under the permit of the Commissioner of Corporations.

The hope of plaintiff to derive any profit from the venture is dependent on the happening of three major contingencies. (1) The sale of sufficient stock to cash purchasers so that $15,000 in cash could be deposited from such sales with the escrow holder. Before the deposit of such sum in escrow no money could be released to the corporation. (2) The successful operation of the soil renovator. (3) Sufficient contracts with agriculturists for renovation of soil at prices that would return a profit to the corporation.

Plaintiff attempted to show that sufficient stock could have been sold to permit the corporation to withdraw the money from escrow and start its operations. In doing this he testified concerning two prospective purchasers of stock. One was a "steel man" living in Hollywood, and the other was A. M. Presser.

Plaintiff did not know the name, address, or financial resources of this nebulous "steel man" who had been referred to by Hunt and Ebert in a conversation with plaintiff. This evidence is too unsubstantial to indicate that this person was even a fair prospect to whom stock might be sold.

The other prospective purchaser was A. M. Presser who was not called as a witness. Plaintiff testified that he met Presser when he was interested in investing $35,000 or $40,000 in real estate in San Diego; that he took Presser to Imperial Valley to investigate the soil renovator and introduced him to Ebert and the two Hunts; that Presser then forgot the real estate transaction and wanted to purchase the stock of the company instead; that Presser was ready, willing and able to purchase the stock but Ebert and the Hunts did not follow up and make the sale. On cross-examination he testified that he knew nothing of the worth of Presser, his financial ability or the amount of his assets; that he believed Presser had some money of his own and thought he was representing some wealthy man, without being able to give any ground for this belief. There is nothing substantial in this evidence to indicate that Presser was financially able to purchase the stock had he desired to do so.

If Presser in fact really wanted to purchase the stock, and had the means to make the purchase, there is no reason why the sale could not have been made. The Penry & Mason contract was not exclusive. The sale could have been made by the corporation through an agent or broker duly appointed for that purpose. The members of the board of directors were plaintiff, Trumbull and Hunt. There is nothing to suggest that Trumbull was not faithful to his trust as director of the corporation. He and plaintiff constituted a majority of the board of directors and they could have authorized the sale through an agent or broker over the objection of Hunt. They did nothing towards making the sale.

There is no substantial evidence in the record to show that the stock of the company could have been sold to Presser or anyone else had Ebert and the Hunts been faithful to the company and tried to sell the stock.

The evidence on the benefits to be derived from the use of the soil renovator is sharply conflicting. No finding was made on this question but had one been made to the effect that it accomplished the purposes for which it was manufactured such a finding would have had evidentiary support.

Plaintiff testified that several farmers wanted to contract for the use of the soil renovator at the price of $25 per acre; that it cost seven or eight dollars an acre to operate the machine. There is nothing to indicate the number of acres of land to be renovated if these offers could have been accepted

so the prospective profits cannot be estimated. Further, to enter into these contracts and perform them, it would have been necessary for the company to have had a machine. It had no assets except the Woods contract assigned to it by plaintiff. It could obtain no money with which to acquire a machine except through sale of stock. Thus its ability to enter into and perform these contracts and reap a profit from them depended on its ability to sell its stock. As the evidence fails to show any ability to sell stock there is no showing of any ability to enter into and perform these contracts or profit from them. Thus there is no substantial evidence of any prospective profits from the operations.

It follows that the evidence of any damage suffered by plaintiff from the wrongful acts of appellants, assuming that they were wrongful, is too speculative to support the judgment; that the trial court was correct when he concluded that "what profits plaintiff might have made are speculative and uncertain."

The portion of the judgment against appellants is reversed.

Barnard, P. J., and Griffin, J., concurred.