[Civ. No. 19023. Second Dist., Div. One. Mar. 31, 1953.]

JERRY D. TURNER, Appellant, v. THE RALPH M. PARSONS COMPANY (a Corporation) et al., Respondents.

Trippet, Newcomer, Yoakum & Thomas and Henry F. Walker for Appellant.

Betts, Ely & Loomis, Tripp & Callaway and Hulen C. Callaway for Respondents.

DORAN, J.—Plaintiff herein sought to recover damages for personal injuries sustained when an oil drum or barrel fell from a 32-foot high tower of an elevator which was part of a conveyor system, resulting in skull fractures and permanent injury. At the close of plaintiff's case motions for nonsuit in behalf of three defendants, the A. J. Bayer Company, the Ralph M. Parsons Company, and A. F. Comstock, were granted. The appeal was dismissed as to the respondent A. J. Bayer Company.

It appears that plaintiff's employer, the Shell Chemical Corporation, desired to install a system for transporting oil drums from one side of a railroad track up and over the track and down on the other side to a platform. The Ralph M. Parsons Company was the general contractor for the job, defendant Comstock was subcontractor for installation, and the defendant Bayer had manufactured the instrumentality in question. The rough or basic idea was that of Shell; the detailed design was prepared by Comstock or Bayer or by both. Neither the contract with Shell nor designs for the system call for any guard or housing on the elevator tower, the specification describing the hoist as "not enclosed." There is no claim that either Parsons or Comstock failed to comply with the contract or designs.

Work was begun on construction of the system in December, 1948. When the device was first tested on March 17, 1949, the automatic feeder device which conveyed the drums into the elevator shaft did not work properly, and two or three days before the date of plaintiff's accident, which occurred on March 25, 1949, the automatic feed was removed by employees of Bayer and Comstock at the request of Shell through Parsons, for fixing. In the absence of the automatic device, Shell employees were used to manually load the elevator, plaintiff being thus engaged when a drum fell from the top of the elevator. Photographs offered in evidence show guards placed on the front of the elevator shaft after plaintiff's accident.

The construction work had not been completed at the date of the accident. There was evidence that, as portions of the system were brought to the lot, these were put to use as speedily as possible before the entire system was assembled. At the date of the accident, as already indicated, the apparatus was being used although because of certain defects in performance the automatic feeder device could not be used. That there was knowledge of this use can hardly be doubted. Com-

stock was personally present on frequent occasions; Coger, Comstock's superintendent, spent nearly every day at the site, and testified to having knowledge that Shell employees were operating the conveyor.

Appellant's case is predicated on the claim that notwithstanding defendants' knowledge that the system was being manually operated by Shell employees, and appreciating the dangers connected therewith, the defendants neither "warned Shell or its employees not to do so," and took no steps by way of temporary guard or otherwise, "to prevent the drums, wobbly at the top of the elevator, from falling and injuring such an employee." Appellant does not claim that, as a part of the completed structure, defendants were obligated under the contract to install permanent guards on the elevator shaft.

The record discloses testimony by Comstock in reference to telling "Mr. Grundy (Shell's engineer) not to let any Shell employees work around the vicinity of the elevator," this conversation occurring two or three days before the accident. The statement was made, says Comstock, because "I figured that the elevator might become jammed if the automatic feeding device was not in operation. It had been removed. . . . And there might be some danger also."

Engineer Grundy denied receiving such warning and testified that when the difficulties with the automatic feeding device became apparent, "Mr. Comstock indicated that it would be satisfactory to pass the drums over the elevator mechanism, since it was operating in a quasi-satisfactory state and that repairs would be taken care of just as quickly as his foreman could get to them." The device was then being operated manually by Shell employees in view of Comstock and Grundy.

Parsons' construction superintendent, Kribs, testified to difficulties encountered in the operation of the system, and that the crossarms which carried the drums up the elevator, also called baskets or carriages, "at the top did sway a bit but a little grease eliminated that"; this treatment "brought your swaying to a minimum, no more than would be expected in a machine of that type."

The rule in reference to matters of nonsuit is stated in *Raber* v. *Tumin,* 36 Cal.2d 654, 656 [226 P.2d 574], as follows: "While in most appeals it is the duty of the reviewing court to indulge every reasonable intendment in favor of sustaining the trial court, substantially the reverse is true where the appeal is from an order of nonsuit. ▪ In the latter case,

the appellate court must view the evidence as though judgment had gone in favor of the appellant, and order a reversal if such judgment can be sustained.''

■ The granting of a motion for nonsuit is warranted ''when, and only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from the evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.''

Much of the argument contained in the briefs has to do with the ultimate merits of the case, the liability or nonliability of the defendants. This appeal, however, is not from a judgment determining liability and is concerned only with the question whether the trial court was justified in taking the case from the jury and ordering a nonsuit. Whether the jury should ultimately find for plaintiff or defendants is beside the point. As hereinbefore indicated, the rules concerning the granting of nonsuits and the review of such orders are well defined and are not questioned by the parties hereto. Under these rules every reasonable intendment in favor of plaintiff's case must be indulged in.

In a case such as this, involving several defendants, it is not unusual for each defendant to attempt to place the blame on someone else. So, on the present appeal, it is suggested that the fault, if any, was that of Shell, plaintiff's employer, or perhaps that of the plaintiff on the theory of assumption of risk. Due to the Workman's Compensation Act, Shell is not a party defendant. And even if Shell were to be deemed at fault, this would not necessarily relieve the defendants from liability. This question of fault and liability, under a favorable view of evidence offered by the plaintiff, required by the above rule, entitles plaintiff to a jury determination of the issue.

As stressed in appellant's brief, the apparatus had not been finally completed at the time of the accident. Comstock and Parsons had not yet finished the work called for by the contract; the obligation to carry on the project in a safe and proper manner and to complete the same, was still in force. Plaintiff's complaint contains the usual, general allegations of negligence ''in designing and constructing the said roller conveyor system,'' rather than more specific charges of wrongdoing. More than one theory of liability may well be included

in its phraseology. If the only point of possible liability lay in defendants' failure to install a permanent guard on the elevator shaft, defendants' argument that the contract with Shell did not require such installation, might have weight. This, however, is by no means the complete story.

 Without either deciding or intimating that the defendants are or are not liable, a review of the record indicates that plaintiff was wrongfully deprived of the right to a jury determination. Construing the evidence in plaintiff's favor, the jury might conceivably have determined that the defendants, experts in construction and operation of such devices, must have known of the danger in question, which knowledge carried with it an obligation to warn those persons exposed to such danger, or to otherwise furnish protection while the apparatus was in process of construction.

The record discloses evidence to the effect that Comstock recognized that there might be some danger in the manual operation necessary because of the absence of the automatic feed device, and that a warning was given to Shell's engineer. This warning was denied and the engineer maintained that Comstock had indicated that it would be ''satisfactory'' to make use of the apparatus. The weight and credibility of this evidence was a matter of prime importance and particularly within the province of the jury to decide.

Other similar instances might be mentioned. There was, for example, evidence that upon reaching the top of the elevator shaft, the drums or barrels swayed to some extent and that this situation was known to the defendants. A jury might draw the not unreasonable inference that this swaying or wobbling not only constituted a present and recognizable danger but that it was the fault of the defendants and the actual cause of the drum's falling on plaintiff. These factual issues were, by the trial court's order, withdrawn from the jury's consideration.

The parties herein had seen fit to demand a jury trial rather than to leave decision of the issues to a judge as trier of the facts. Obviously, the procedure involving the granting of a nonsuit was not designed nor intended to defeat the right to a jury trial. The cases indicate that nonsuits should be granted sparingly and only in those situations where there is rightfully no factual issue for a jury to decide. If the evidence is of such a nature that a judgment for plaintiff can on no theory be sustained, then a nonsuit is clearly proper. As .

hereinbefore indicated, the present case is not one of that nature, and plaintiff was entitled to the verdict of the jury.

The order granting a nonsuit is reversed.

White, P. J., and Drapeau, J., concurred.

A petition for a rehearing was denied April 21, 1953, and respondents' petition for a hearing by the Supreme Court was denied May 28, 1953.