[Civ. No. 22828. Second Dist., Div. One. Aug. 10, 1959.]

FRANCES AGNEW, Appellant, v. FLOYD ROSWELL PARKS et al., Respondents.

Frances Agnew, in pro. per., Montgomery G. Rice and Earle K. Stanton for Appellant.

Harold B. Pool, in pro. per., Richard L. Kirtland, Frederick O. Field, J. Rolf deWied, Jorz & Sawtelle, Hill, Farrer & Burrill, Anson B. Jackson, Jr., Elliott H. Pentz, Schell, Delamer & Loring and Henry F. Walker for Respondents.

LILLIE, J.—This is an appeal from a judgment entered on an order granting motions for nonsuit in an action based on a fifth amended complaint entitled "For Damages for Conspiracy to Obstruct the Orderly Prosecution of a Civil Action and for Concerted Refusal to Deal." Suit was filed November 15, 1951, as the result of a series of trials which arose out of a malpractice action brought by plaintiff against Dr. Edwin Larson on July 10, 1945, based upon his failure to take X-rays for injuries to her hip sustained by a fall on March 3, 1943. The first trial, on July 10, 1946, resulted in a judgment of

nonsuit reversed on appeal (82 Cal.App.2d 616 [186 P.2d 450]); the second, in a judgment for defendant also reversed (97 Cal.App.2d 557 [218 P.2d 66]); and the third, pending when the instant action was instituted, in a $37,883.91 judgment affirmed (134 Cal.App.2d 433 [286 P.2d 556]) and now final. The appeal as to John C. Wilson, now deceased, has heretofore been dismissed.

The complaint contained two causes of action—demurrers to the first were sustained without leave to amend; to the second, demurrers were overruled, and the cause proceeded to trial before a jury resulting in the within judgment of nonsuit.

Appellant contends that the trial court erred in sustaining, without leave to amend, demurrers to the first cause of action; and in granting motions for nonsuit on the second. Arising out of the latter is respondents' claim that the allegations in the complaint do not constitute a cause of action. As to the sufficiency of the pleading, plaintiff has offered for the aid of this court no substantial argument or citation of authority.

The first assignment of error is without merit; not only does the first cause of action not sufficiently allege a good cause but, for the most part, is barred by the statute of limitations. Very briefly, the pleading charged a conspiracy alleging that plaintiff sought, for a consideration, to get certain doctors to testify as expert medical witnesses on her behalf in a malpractice case, but was unsuccessful due to threats of the Los Angeles County Medical Association to expel them from membership and cause a cancellation of their public liability insurance if they did so; and that defendants submitted Dr. Larson's defense in plaintiff's case to a "malpractice committee" of the Association on which it rendered an opinion declaring him free from negligence, and published it to each member of the Association; and further alleged that defendants conspired to obstruct the orderly prosecution of plaintiff's malpractice action and cause a concerted refusal to deal, by threatening members of the Association to prevent them from testifying, concealing 18 X-rays of her injuries, and causing the superior court on July 14, 1946, upon recommendation of the Association, to appoint Dr. Parks as a "distinguished and unprejudiced" witness to examine plaintiff and testify; that such "recommendation" was in accord with a plan to recommend a doctor favorable to Larson, represent him as being impartial and then have him testify for the defendant; and that after Parks was appointed by the court he appeared at the first trial

as an alleged disinterested witness for plaintiff, testifying unfavorably to plaintiff's case.

Basically this cause is predicated upon a conspiracy to obstruct the orderly prosecution of a civil action, to refuse to deal, and to defraud. ■ The long-established rule that a conspiracy, in and of itself, however atrocious, does not give rise to a cause of action unless a civil wrong has been committed resulting in damage (*Herron* v. *Hughes*, 25 Cal. 555) requires a determination of whether the pleaded facts show something was done which, without the conspiracy, would give rise to a right of action (*Orloff* v. *Metropolitan Trust Co.*, 17 Cal.2d 484 [110 P.2d 396] ; *Mox Incorporated* v. *Woods*, 202 Cal. 675 [262 P. 302] ; *Schaefer* v. *Berinstein*, 140 Cal.App.2d 278 [295 P.2d 113] ; *Perry* v. *Meikle*, 102 Cal.App.2d 602 [228 P.2d 17] ). ■ The only purpose of the pleader in employing a conspiracy is to link together and make equally liable with him who carries out the scheme one who has agreed to a common design to commit a wrong (*Mox Incorporated* v. *Woods*, 202 Cal. 675 [262 P. 302] ). To be actionable therefore, the alleged combination must result in the commission of a civil wrong, either by the perpetration of an unlawful act or some injurious act by unlawful means, resulting in damage (*McIntire* v. *Chevrolet Motor Co.*, 115 Cal.App. 187 [1 P.2d 40] ; *Lynch* v. *Rheinschild*, 86 Cal.App.2d 672 [195 P.2d 448] ; *Rose* v. *Ames*, 53 Cal.App.2d 583 [128 P.2d 65] ; *Sweeley* v. *Gordon*, 47 Cal.App.2d 385 [118 P.2d 16] ; *Peterson* v. *Corporation of America*, 21 Cal.App.2d 527 [69 P.2d 904] ).

Appellant's real complaint stems from her alleged unsuccessful attempt to secure the expert testimony of nine doctors who refused to testify for her in a malpractice action against Dr. Larson because the Los Angeles County Medical Association assertedly threatened to expel them from membership and report them to their insurance carriers to cause cancellation of their insurance policies if they did so. Although a determination of the issues before us depends upon whether, under the facts alleged, defendants have committed a civil wrong, and the ethical considerations so pertinaciously advanced by appellant have little place in our resolve of a purely legal problem, however, because of the nature and extent of her argument we are impelled to comment briefly on her scathing condemnation of what she asserts to be a common design among respectable medical practitioners to intimidate members of their own profession to prevent them from testifying against each other and rendering services as experts for plaintiffs in malpractice

actions regardless of merit, " 'due largely to the pressure exerted by medical societies and public liability insurance companies which issue policies of liability insurance to physicians covering malpractice claims' " (Minority opinion of the late Mr. Justice Carter, *Huffman* v. *Lindquist*, 37 Cal.2d 465, 484 [234 P.2d 34, 29 A.L.R.2d 485]; A.O.B. p. 8.)

 Quite apart from this language and the allegations of plaintiff's complaint, the truth of which we are bound at this point to assume (*Clark* v. *Lesher*, 106 Cal.App.2d 403 [235 P.2d 71]), one cannot long be acquainted with our courts without recognizing the existence of just such a serious ethical problem growing out of the surging tide of malpractice litigation which, if not resolved, may well threaten not only the fair administration of justice but irreparable harm to the medical profession which can only result in a frustration of public confidence in, and an impugnation of the integrity of, one of the world's most honorable professions. We are acutely aware of the problems arising out of the steadily increasing volume of negligence actions plaguing doctors and that they, more than the members of any other profession because of the serious personal nature of their services, are subject to attack by many unfounded claims of malpractice; but it cannot be denied even by the profession itself that there are also many claims of substantial merit. In recognition thereof our trial courts have encouraged local medical societies to cooperate in the formation of a panel of impartial qualified medical doctors from which they may with confidence appoint experts to examine claimants involved in negligence actions against doctors and give their unbiased opinion, which endeavor has recently been adopted by our state Legislature authorizing the new so-called Impartial Medical Testimony Plan. Perhaps the medical profession, having previously tried to cope with the problem of malpractice litigation in a variety of ways with obviously not too much success, will find that its faithful cooperation with the trial courts in this regard will result in the destruction of the ill-reputed "conspiracy of silence" (A.O.B. p. 10) said to pervade malpractice litigation, and prevent further serious attacks on the dignity and integrity of this fine profession, and the competent and proficient men and women who comprise it.

 Absent a showing in her complaint that any doctor had previously been retained by plaintiff to examine or treat her, we are faced with the question whether a doctor, who has

no relationship with a person growing out of contract to examine or treat, has a duty to enter into an agreement to render services as a medical expert merely upon request. We hold that he does not. ██ Even the Hippocratic Oath, by which every doctor is morally bound, assumes a preexisting relationship of patient and physician, which relationship in its inception is basically contractual and wholly voluntary, created by agreement, express or implied, and which by its terms may be general or limited (*McNamara* v. *Emmons*, 36 Cal.App.2d 199 [97 P.2d 503]). Since there is no established public policy (*Coleman* v. *Middlestaff*, 147 Cal. App.2d Supp. 833 [305 P.2d 1020]) and no legal obligation compelling him to engage in practice, accept professional appointment, or render medical services to anyone who seeks to engage him (38 Cal.Jur.2d, Physicians, § 4, p. 537), we conclude that there is no duty on a doctor's part to agree to serve as an expert witness for one with whom he has no preexisting contractual relationship. ██ In so holding we do not question the well-established rule that a doctor who has treated or examined a patient may be compelled to testify for him as any ordinary witness and answer pertinent questions concerning facts relating to his condition, knowledge of which he acquired through his examination and treatment even though he discovered them by reason of his special or expert training. (*City & County of San Francisco* v. *Superior Court*, 37 Cal.2d 227 [231 P.2d 26, 25 A.L.R.2d 1418]; *McClenahan* v. *Keyes*, 188 Cal. 574 [206 P. 454]; *People* v. *Barnes*, 111 Cal.App. 605 [295 P. 1045]; *People* v. *Conte*, 17 Cal.App. 771 [122 P. 450, 457]).

██ *Sweeley* v. *Gordon*, 47 Cal.App.2d 385 [118 P.2d 16], and other authorities holding that in a civil conspiracy no cause can arise if one had a legal right to do the act complained of, no party becomes liable by reason of the fact he induced one to stand upon and assert his legal rights, and it is not actionable coercion or duress to threaten to do what one has a legal right to do (*Marshall* v. *Packard-Bell Co.*, 106 Cal. App.2d 770 [236 P.2d 201]; *Thomson* v. *Mortgage Investment Co.*, 99 Cal.App. 205 [278 P. 468]; *Mindenberg* v. *Carmel Film Productions, Inc.*, 132 Cal.App.2d 598 [282 P.2d 1024]), compel our conclusion that neither the alleged conduct preventing doctors from testifying nor the activity of the Association in controlling its members in this connection, regardless of motive (*Union Labor Hospital Assn.* v. *Vance Redwood Lumber Co.*, 158 Cal. 551 [112 P. 886, 33 L.R.A. N.S. 1034];

*Scudder Food Products, Inc.* v. *Ginsberg,* 21 Cal.2d 596 [134 P.2d 255]), is actionable, either alone or in combination.

In addition, the cause appears to be barred by the statute of limitations. Although the pleading asserts that the conspiracy was entered into May 4, 1945, and continued to November 24, 1948, it fails to allege any specific act as having occurred on the latter date. ▮ There existing no cause of action for conspiracy in and of itself, the statute of limitations is determined by the nature of the action in which the conspiracy is alleged. ▮ The alleged conduct preventing certain doctors from testifying occurring on July 10, 1946, and prior to the second trial (November 29, 1948) consisted of separate, distinct and completed acts, and a violation of personal rights subject to the one-year limitation (Code Civ. Proc., § 340, subd. 3; *Simons* v. *Edouarde,* 98 Cal.App.2d 826 [221 P.2d 203], which period commenced to run from the time of their commission (*Judson Pacific-Murphy, Inc.* v. *Thew Shovel Co.,* 127 Cal.App.2d Supp. 828 [275 P.2d 841]; *Sonbergh* v. *MacQuarrie,* 112 Cal.App.2d 771 [247 P.2d 133]).

The alleged conspiracy to obstruct the orderly prosecution of her malpractice action consisted of false representations causing the court to appoint Dr. Parks as a disinterested expert witness, and him to falsely testify against plaintiff; and concealment of certain evidence (X-rays) at the malpractice trial. ▮ The common law crime of the obstruction of justice (*Lorenson* v. *Superior Court,* 35 Cal.2d 49 [216 P.2d 859]) is not recognized under our statutes although various separate offenses are designated ''perjury,'' ''subornation of perjury,'' and ''concealment of evidence'' (36 Cal.Jur.2d, Obstructing Justice, p. 597, § 1). Our Penal Code defines perjury and subornation of perjury as felonies (§§ 118, 127). ▮ However, no civil right can be predicated upon a mere violation of a criminal statute (*Babu* v. *Petersen,* 4 Cal. 2d 276 [48 P.2d 689]), and on the theory that there must be an end to litigation (41 Am.Jur., Perjury, § 81, p. 45), aside from defamation and malicious prosecution, no injury from false testimony upon which a civil action for damages can be maintained is recognized (*Taylor* v. *Bidwell,* 65 Cal. 489 [4 P. 491]; *Gerini* v. *Pacific Employers Ins. Co.,* 27 Cal.App.2d 52 [80 P.2d 499]; 38 Cal.Jur.2d, Perjury, § 53, p. 439); and since one who by perjury has injured another is not answerable civilly, our courts, as well as those in other jurisdictions, have held that neither is the one procuring the same. (*Taylor*

v. *Bidwell,* 65 Cal. 489 [4 P. 491]; *Cragie* v. *Roberts,* 6 Cal. App. 309 [92 P. 97]; *Gerini* v. *Pacific Employers Ins. Co.,* 27 Cal.App.2d 52 [80 P.2d 499]; *Felts* v. *Paradise,* 178 Tenn. 421 [158 S.W.2d 727, 139 A.L.R. 467]; *Kantor* v. *Kessler,* 132 N.J.L. 336 [40 A.2d 607]; *Kinter* v. *Kinter,* 84 Ohio App.399 [87 N.E.2d 379]; *Nones* v. *Security Title & Guaranty Co.,* N.Y. 4., Misc.2d 1057 [162 N.Y.S.2d 761]). ▉ Concealing or withholding documentary evidence is made a felony by section 135, Penal Code. Akin to perjury and subornation of perjury, this too is one of the offenses partaking of the nature of the common law crime of obstruction of justice (*Lorenson* v. *Superior Court,* 35 Cal.2d 49 [216 P.2d 859]) and subject to the same rule foreclosing the maintenance of a civil action for injury arising out of perjury, subornation of perjury and forged documentary evidence (*Cragie* v. *Roberts,* 6 Cal.App. 309 [92 P. 97]).

▉ That portion of the conspiracy based on fraud is governed by the three-year statute of limitations applicable to an action for relief on the ground of fraud (Code Civ. Proc., § 338, subd. 4). ▉ It is apparent on the face of the complaint that the last fraudulent act occurred over three years before the pleading was filed; thus in order to avoid the bar, plaintiff must, if she can, plead discovery thereof to have been within three years prior to the commencement of the action (*Myers* v. *Metropolitan Trust Co. of Cal.,* 22 Cal.App.2d 284 [70 P.2d 992]; *Douglas* v. *Douglas,* 103 Cal.App.2d 29 [228 P.2d 603]; *Bainbridge* v. *Stoner,* 16 Cal.2d 423 [106 P.2d 423]; *Knapp* v. *Knapp,* 15 Cal.2d 237 [100 P.2d 759]). The fraudulent acts relating to Dr. Parks were alleged to have occurred July 14 and 15, 1946, more than five years before the original complaint was filed, and the pleading having failed to allege facts relating to their discovery (*Mills* v. *Mills,* 147 Cal.App.2d 107 [305 P.2d 61]), they are barred by the three-year statute.

▉▉ Since it is presumed she has stated her cause as favorably as the facts permitted (*Genis* v. *Krasne,* 47 Cal.2d 241 [302 P.2d 289]; *Faulkner* v. *California Toll Bridge Authority,* 40 Cal.2d 317 [253 P.2d 659]), and plaintiff, having had ample opportunity to amend and made five unsuccessful attempts to state a good cause of action, the trial court was justified in concluding she could not bring her action within the law. (*Lemoge Electric* v. *County of San Mateo,* 46 Cal. 2d 659 [297 P.2d 638]; *Potter* v. *Richards,* 132 Cal.App.2d 380 [282 P.2d 113]; *Taliaferro* v. *Wampler,* 127 Cal.App.2d

306 [273 P.2d 829]; *Williamson* v. *Joyce,* 137 Cal. 151 [69 P. 980].)

As to the second cause of action, first raised is respondents' claim that the allegations therein do not constitute a good cause of action and the lower court erred in overruling the demurrers thereto. Although appellant devotes little time to this point, there arises from her pleading a serious issue of damage. In summary, she alleged that on July 10, 1946, for the purpose of damaging her rights in her malpractice action and knowing such representations to be false, defendants conspired to have Dr. Parks falsely represent to plaintiff and the court that he was a disinterested and unprejudiced witness, would give independent testimony, knew none of the parties to the action, and had not been on the staff of the California Hospital, in order to induce reliance upon them; that she had no knowledge of the falsity of these representations until November 24, 1948, when at the second trial Parks testified he had known Larson prior to the date of the first trial and had served with him on the California Hospital staff; that Parks, intending to give biased and prejudicial testimony for the benefit of Larson, agreed with the Los Angeles County Medical Association to submit himself for appointment by the court as a disinterested witness in the trial of plaintiff's action, and falsely represented to her and the court that he was disinterested, did not know Larson or Pool and had not served on any hospital staff with Larson; that although Parks was well acquainted with Larson and Pool and at one time served on the staff of the California Hospital with Larson, he made contrary representations to mislead plaintiff, which she relied upon believing them to be true; and plaintiff employed Dr. Parks as an ''independent and impartial'' expert medical witness, paying him $200 therefor and $50 for his examination as ordered by the court, thereby suffering general damages in the sum of $250, specific damages in the sum of $2,500 for court costs and legal expenses in connection with both trials and appeals, and punitive damages in the sum of $50,000.

The gist of the alleged conspiracy is fraud (Civ. Code, § 1709). The respondents do not seriously contend that appellant failed to properly allege that certain false representations were made by defendant knowing them to be false with the intent to induce plaintiff to rely upon them, and that she relied thereon (*Lawson* v. *Town & Country Shops, Inc.,* 159

Cal.App.2d 196 [323 P.2d 843] ; *Zinn* v. *Ex-Cell-O Corp.*, 148 Cal.App.2d 56 [306 P.2d 1017] ) ; but they advance the position that the pleading failed to sufficiently allege resulting damage to her. It is the rule that fraud without damage is not actionable (*Herron* v. *Hughes*, 25 Cal. 555; *Benson* v. *Garrett Inv. Co.*, 135 Cal.App.2d Supp. 853 [287 P.2d 405] ), and one is not entitled to any relief thereon unless damage is alleged and proved (*Munson* v. *Fishburn*, 183 Cal. 206 [190 P. 808] ; *Hunter* v. *McKenzie*, 197 Cal. 176 [239 P. 1090] ; *Read* v. *Mortgage Guarantee Co.*, 11 Cal.App.2d 137 [53 P.2d 377] ).

 Plaintiff's first item of damage, in the sum of $2,500, is predicated upon her expenditure of court costs and legal fees in the prosecution of two malpractice trials and appeals, none of which were included or legally allowable in cost judgments rendered in her favor by this court on appeal. No further averment concerning this item appears in her complaint—only the general allegation that defendants' acts were done for the purpose of damaging her rights at law against Larson and destroying her effective means of recovery. Therefore, even if properly alleged, the damage plaintiff would have suffered could only have been due to her failure to prevail in her suit and the resulting legal expense to her, the recovery of which would depend upon whether the outcome of the trial would otherwise have been successful; and to show this she must plead and prove a good cause of action for malpractice against Larson, Parks actually gave prejudiced testimony, his fraud caused the trial judge to enter the judgment of nonsuit against her, and had the cause gone to the jury she would have prevailed and in a definite amount.

 Damage to be subject to a proper award must be such as follows the act complained of as a legal certainty and we conclude that the difficulty in ascertaining damages herein is insurmountable (*Taylor* v. *Hopper*, 207 Cal. 102 [276 P. 990] ; *Ramsey* v. *Penry*, 53 Cal.App.2d 773 [128 P.2d 399] ; *Campbell* v. *Birch*, 19 Cal.2d 778 [122 P.2d 902] ), they are too remote, speculative and uncertain (*Commercial U.A. Co.* v. *Pacific G. & E. Co.*, 220 Cal. 515 [31 P.2d 793] ; *Griffith Co.* v. *San Diego College for Women*, 45 Cal.2d 501 [289 P.2d 476, 47 A.L.R.2d 1349] ), and that the damage depends on the act of a third person or the happening of a certain event (*McQuilkin* v. *Postal Tel. Cable Co.*, 27 Cal.App. 698 [151 P. 21] ; *McGregor* v. *Wright*, 117 Cal.App. 186 [3 P.2d 624] ).

The claim of plaintiff against Larson was a highly disputed one both from the standpoint of liability and injury, and

unliquidated in amount providing no practicable measure of damages in this action. A similar situation arose in *Taylor* v. *Hopper*, 207 Cal. 102 [276 P. 990], in which plaintiff sued for the difference between the amount prayed for in a personal injury action and the amount she received in a compromise settlement defendants forced her to make. The court held that the complaint did not state a cause of action due to the insurmountable difficulty in determining damages because the jury could not determine without some measure what amount, if any, would have been accorded plaintiff in the original action from another jury had she not compromised her action and proceeded to trial. A similar holding is found in *Feldesman* v. *McGovern*, 44 Cal.App.2d 566 [112 P.2d 645], in which a client sued his lawyer for failing to file a petition for his discharge in bankruptcy. The court, citing *Lally* v. *Kuster*, 177 Cal. 783 [171 P. 961] ; *McMillan* v. *Greer*, 85 Cal.App. 558 [259 P. 995] and *Martin* v. *Hood*, 203 Cal. 351 [264 P. 478], held that a good cause was not stated because the complaint must allege that had the lawyer not been negligent and performed the act the client would have been successful in the action or it would have resulted beneficially to him.

Although we conclude plaintiff's alleged loss to be too uncertain, remote and speculative to constitute a proper basis for computation of damages, we do not find the item of $250 damage subject to the same objections. She has alleged that in reliance on defendant's knowingly false representations and believing them to be true, she retained Parks as an expert medical witness and paid him $250 for his services, which she would not have paid had she known the truth.

So, too, has she properly alleged a general conspiracy, continually referring to the acts of "all defendants" and "each of them," not only in furtherance of a conspiracy, but in creation of a plan to misrepresent Parks to the plaintiff as an unprejudiced witness for the purpose of damaging her. Reading the allegations in the second cause of action as a whole (*Schessler* v. *Keck*, 125 Cal.App.2d 827 [271 P.2d 588]), it is obvious they charge concert of action among all defendants according to a definite plan to accomplish the purpose of the conspiracy, their illegal actions in furtherance of a common scheme or design to achieve the unlawful purpose of their combination, and their knowledge of the conspiracy and its unlawful purpose (*Clark* v. *Lesher*, 106 Cal. App.2d 403 [235 P.2d 71] ; *James* v. *Herbert*, 149 Cal.App.2d

741 [309 P.2d 91]); and assuming all of the allegations to be true, plaintiff thereunder would be entitled to compensatory damage in the amount of $250.

Plaintiff's claim to punitive damage is likewise properly pleaded (Civ. Code, § 3294) and although she prayed for $50,000, the allowance or disallowance (*Clark* v. *McClurg*, 215 Cal. 279 [4 P.2d 149, 9 P.2d 505, 81 A.L.R. 908] ; *Guillory* v. *Godfrey*, 134 Cal.App.2d 628 [286 P.2d 474]) and amount (*Hartzell* v. *Myall*, 115 Cal.App.2d 670 [252 P.2d 676]; *Browand* v. *Scott Lbr. Co.*, 125 Cal.App.2d 68 [269 P.2d 891]) thereof are reposed in the sole discretion of the jury.

Concerning the judgment of nonsuit, we note that respondents recount and construe the evidence as though this appeal were from a judgment in their favor rendered after a trial on the merits. Their purely partisan view of the evidence has no place in a determination of the propriety of an order granting a motion for nonsuit. On the contrary, we are bound to construe the evidence most strongly against respondents and indulge every inference fairly deducible and every presumption fairly arising therefrom in favor of plaintiff (*Katemis* v. *Westerlind*, 120 Cal.App.2d 537 [261 P.2d 553]) ; *Estate of Bryson*, 191 Cal. 521 [217 P. 525]) ; and can consider only plaintiff's evidence and every piece thereof and reasonable inference therefrom tending to sustain her allegations (*Howard* v. *General Petroleum Corp.*, 108 Cal.App.2d 25 [238 P.2d 145] ; *Estate of Jamison*, 41 Cal. 2d 1 [256 P.2d 984]). Adopting these rules of construction we briefly summarize the pertinent evidence of defendants' alleged conspiracy and fraud.

Before the first trial in her malpractice case (July 10, 1946), plaintiff communicated with, and personally requested, nine medical doctors, all members of the Los Angeles County Medical Association, to testify for a consideration as expert medical witnesses on her behalf, all of whom refused. Three gave the following reasons: one stated his malpractice insurance would be cancelled and he would jeopardize his membership in the Los Angeles County Medical Association if he testified; another said "the practice of doctors appearing for plaintiffs was frowned upon"; and Dr. Paul McMasters, respondent herein and one of plaintiff's own doctors who would not appear at the first trial but did so at the second, told her "(Y)ou had a pretty rough time, but I could not testify against another doctor," and if she planned to call an expert who is a member of the Los Angeles County

Medical Association, he "cannot testify for (you) against another doctor." During a discussion among Larson, Pool, plaintiff and her attorney, the latter stated he was having difficulty getting doctors to testify for plaintiff and Pool, Larson's counsel, said "You will never get a doctor to testify against another doctor. No doctor would dare do it."

Thereafter, plaintiff at the first trial asked the court to appoint under section 1871, Code of Civil Procedure, a disinterested medical witness to testify as an expert. Agreeing to do so, the judge said "I don't want to appoint a doctor that is personally acquainted with either of the parties or the attorneys. That is a starting point"; he also advised her attorney plaintiff would have to pay to whomever he appointed a fee of $50 for an examination and $100 per day for testifying. The judge then called the Los Angeles County Medical Association and said he was hearing a malpractice case, wished to "appoint a disinterested physician" to testify as an expert in the case, wanted it to furnish the name of a doctor who would be willing to do so, and would like "to get a doctor that was unknown to any of the parties or the attorneys and who would come in and testify as a disinterested witness," giving it the names of the parties and counsel.

Four days later the Los Angeles County Medical Association advised the judge it had communicated with Dr. Floyd Parks; and submitted his name for appointment. The judge asked Dr. Larson and plaintiff if either knew Dr. Parks and each responded in the negative. He then called Dr. Parks and told him he was hearing a malpractice case and wanted "to obtain a physician to testify in the case that was wholly disinterested and unrelated to any of the parties or to the attorneys," and naming each, asked him if he knew any of them. Parks told him he was not acquainted with any of them and was willing to examine plaintiff and testify. The judge then asked Pool and Silver if they knew Parks and each answered "no." He then appointed Dr. Parks and, upon his instructions, plaintiff went to Dr. Parks' office taking her X-rays, where she reminded him he had been appointed by the court to serve as an unprejudiced, disinterested witness and that he did not know any of the parties or their counsel, to which he responded "I understand that." She asked him specifically if he knew Dr. Edwin Larson and he replied "I don't think so." He then consulted a book wherein two doctors by the name of Larson were listed and after identifying defendant Parks again said in response to her repeated

question if he knew Dr. Edwin Larson, "No, I never heard of him." She then asked him had he ever been on the staff of any hospital with Larson, and he said he "had never been on the staff of a hospital with him." Directing his attention to the California Hospital she asked him if he had ever been on its staff and he replied "No, I have never been over there." "Are you sure of that?" plaintiff persisted, and he answered "Yes." Then plaintiff submitted to Dr. Parks her medical records which bore the name of Dr. Edwin Larson on the California Hospital charts and X-rays. Plaintiff believed the hereinabove representations to be true and in reliance thereon engaged the services of Dr. Parks paying him a $250 fee—$150 when he finished the examination and $100 after he testified.

The day following his examination of plaintiff, Dr. Parks testified to the effect that Larson was free from negligence in treating plaintiff. He not only declared Larson had used all the skill and care an ordinarily prudent person should have exercised, but voluntarily added plaintiff sustained a second fall which was never mentioned by her and which did not appear in her history, or in his medical report to the court which, on the contrary, stated she had not sustained a second fall.

At the second trial, plaintiff did not request Dr. Parks to testify for her although he appeared and testified as a witness for Larson without compensation and at the latter's request without subpoena.

Parks did not deny that the judge, before appointing him as an expert witness, asked him if he knew Dr. Larson and he responded that he "did not." He admitted that the judge advised him it was his desire to find an expert who was not acquainted with either party or counsel and would be "completely disinterested" and unprejudiced. However, he denied he knew Larson until he was confronted with a transcript of the third trial, wherein on cross-examination he was asked "did you, or didn't you ever meet Dr. Edwin Larson at the California Hospital?" to which he answered "I met him there, sure." Then counsel asked Parks if prior to 1946 he ever met Larson in the California Hospital. He said he didn't recall. When asked if when he was Chief Resident there in 1928-1929, he ever met Larson, he answered ". . . not that I recall." Shown the transcript of the second trial, he then said, "Well, I think I saw him when I was at the California Hospital . . . I may have seen him, yes." Asked

if he became acquainted with Larson he said "Not very deeply, no." He then admitted he had been on the staff of the California Hospital as chief resident and it was his responsibility to look over Dr. Larson's records along with those of other doctors and that he saw him at the hospital between July, 1928, and January, 1929; also that when he saw Larson in court at the first trial he connected his face with the name and remembered him, but said nothing about it to the trial judge, the parties or counsel.

The records of the Los Angeles County Medical Association and California Hospital disclose that Dr. Parks and Dr. Larson were admitted to membership in the Los Angeles County Medical Association on the same day, March 4, 1929; that in 1928 Larson was on the affiliated staff, on the associated staff from 1930 to 1932, and on the senior staff of the California Hospital from 1933 to 1953; and that Parks was Chief Resident there in 1928 and 1929, on the affiliated staff from 1929 to 1932, 1934 to 1937, and on the courtesy list in 1938.

Four months prior to the first trial, and on April 20, 1944, the Los Angeles County Medical Association which has a Medical Defense Committee, published in its official Bulletin an article written by its then President, Dr. Louis J. Regan, a doctor of medicine and attorney admitted to the bar, performing legal services for the association and advising members threatened with malpractice suits. The Bulletin was circulated among its members and the article therein related to litigation involving members of the medical profession, specifically to the "alarming and vicious" malpractice trend in California, and the "duty of the medical profession to destroy the malpractice 'racket.' " It concluded with " 'The malpractice situation in this community is a miserable one. All our efforts up to this time have failed to improve the situation materially . . . It is crystal clear, however, that it is solely and completely our job. Any legal steps to accomplish the desired end should be taken.' "

The evidence also discloses as to insurance, carriers consider nonmembers a poor risk compared with members of the Los Angeles County Medical Association.

It is true that the fact Dr. Parks testified adversely to plaintiff at the first trial does not in and of itself prove that he was prejudiced, but considering this circumstance together with all other proof in the case there appears to be sufficient evidence in the record before us from which the

jury reasonably could have inferred that all defendants, together and singly, were unanimous in their efforts to prevent plaintiff from prevailing against Dr. Larson. Whether at the end of the trial plaintiff could have ultimately satisfied the jury of the alleged fraud and conspiracy by a preponderance of the evidence is not at this point material, for this is now no matter of consideration for either the trial or appellate court. ▮ In determining whether to grant a nonsuit the trial court, bound to assume the truth of plaintiff's evidence and every inference of fact which may legitimately be drawn therefrom (*Adams* v. *Herman,* 106 Cal.App.2d 92 [234 P.2d 695]; *Carlton* v. *Pacific Coast Gasoline Co.,* 110 Cal.App.2d 177 [242 P.2d 391]), is precluded from resolving factual conflicts, weighing the evidence and determining the credibility of the witnesses, for where a factual conflict appears or where different inferences may be reasonably drawn from the evidence, the case must be submitted to the jury (*Turner* v. *Ralph M. Parsons Co.,* 117 Cal.App.2d 109 [254 P.2d 970]; *Hale* v. *Safeway Stores, Inc.,* 129 Cal.App.2d 124 [276 P.2d 118]). Apparently when he granted the motions some doubt existed in the mind of the trial judge, for he stated: ''Well, maybe those facts should go to the jury for their determination. Maybe it could be questionable as to whether or not from the proof that he was a biased witness . . . Two people looking at the same state of facts may draw a different viewpoint at different times and may reasonably draw different inferences . . .'' ▮ Since the rule applicable to nonsuit operates strongly in favor of plaintiff, it is well settled that where there is a doubt in the court's mind the case should be submitted to the jury (*Jones* v. *Hotchkiss,* 147 Cal.App.2d 197 [305 P.2d 129]).

▮ As to proof of a combination linking all defendants, a conspiracy to defraud may be inferred from indirect and circumstantial evidence (*Dandini* v. *Dandini,* 120 Cal. App.2d 211 [260 P.2d 1033]; *Biggs* v. *Tourtas,* 92 Cal.App. 2d 316 [206 P.2d 871]; *McPhetridge* v. *Smith,* 101 Cal.App. 122 [281 P. 419]) from the nature of the acts done, the relationship of the parties, their interest and other circumstances (*Anderson* v. *Thatcher,* 76 Cal.App.2d 50 [172 P.2d 533]; *Greenwood* v. *Mooradian,* 137 Cal.App.2d 532 [290 P.2d 955]); and plaintiff is entitled to a joint recovery of damages against such defendants as she can show have united or cooperated in inflicting a wrong upon her (*Mox Incorporated* v. *Woods,* 202 Cal. 675 [262 P. 302]). As to respondents Lutheran

Hospital Society of Southern California and Adeline Jones, however, we find no substantial evidence in the record that they were part of the alleged conspiracy, knew of, or participated in it (*Neblett* v. *Elliott,* 46 Cal.App.2d 294 [115 P.2d 872]) and we hold as to them, the motions for nonsuit were properly granted. As to all other respondents appellant was entitled to have the matter determined by the jury.

Respondent's contention that appellant's action was barred by the statute of limitations is not tenable. Although this is a conspiracy action based on fraud, plaintiff alleged she did not have knowledge of the wrongful acts until November 24, 1948. She properly alleged how she discovered them, why, due to defendant's concealment of the true facts, discovery was not sooner made and what she did thereafter by way of investigation to ascertain the truth. There appears to be more than sufficient evidence in the record to sustain her allegations and it is clear that plaintiff sued within three years upon learning of defendants' conduct.

As to respondents Lutheran Hospital Society of Southern California and Adeline Jones, the judgment is affirmed. As to all other respondents the judgment is affirmed with the exception of that portion relating to the $250 item of damage and punitive damages as alleged in the second cause of action, which portion is reversed with directions that a new trial be had on these issues.

White, P. J., and Fourt, J., concurred.

Petitions for a rehearing were denied August 28, 1959, and the petitions of respondents Paul E. McMaster and Los Angeles County Medical Association for a hearing by the Supreme Court were denied October 7, 1959. White, J., did not participate therein.