Filed 2/24/22  Baral v. Schnitt CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ROBERT C. BARAL,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>DAVID SCHNITT,<br><br>Defendant and Appellant. | B298050<br><br>(Los Angeles County<br>Super. Ct. No. BC475350)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 28, 2022, be modified as follows:

1.  On page 2, the last sentence of the second full paragraph is deleted and the following is inserted in its place:

> Accordingly, we affirm the order awarding Schnitt anti-SLAPP fees but vacate the judgment as to Baral's causes of action for fraud and breach of fiduciary duty and remand the matter with directions to enter judgment for Schnitt on those causes of

action. The judgment on Baral's cause of action for declaratory relief remains unchanged.

2. On page 23, the Disposition paragraph is deleted and the following paragraph is inserted in its place:

The judgment is reversed in part and the matter remanded, and the trial court is ordered to enter judgment in favor of Schnitt on Baral's causes of action for fraud and breach of fiduciary duty. The judgment is affirmed as to Baral's cause of action for declaratory relief. The order granting Schnitt anti-SLAPP fees is affirmed. Schnitt is to recover costs on appeal.

This modification effects a change in the judgment.

Appellant Baral's petition for rehearing is denied.


_____

ROTHSCHILD, P. J.      CHANEY, J.          BENDIX, J.

2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| ROBERT C. BARAL, | B298050 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC475350) |
| v. | |
| DAVID SCHNITT, | |
| Defendant and Appellant. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Randolph M. Hammock, Judge.  Affirmed in part and reversed in part.

Sauer & Wagner, Gerald L. Sauer, and Amir A. Torkamani for Plaintiff and Appellant Robert C. Baral.

Ervin Cohen & Jessup, Michael C. Lieb; Greines, Martin, Stein & Richland, Kent L. Richland, David E. Hackett, and Joseph V. Bui for Defendant and Appellant David Schnitt.

_____

Robert C. Baral sued David Schnitt, alleging fraud and multiple breaches of fiduciary duty concerning IQ BackOffice LLC (IQ), a company they owned and managed. After Schnitt successfully moved to strike portions of the complaint under the anti-SLAPP statute (Code Civ. Proc., § 425.16),[1] a jury awarded Baral $2.5 million in compensatory damages and $1 million in punitive damages. The trial court denied Schnitt's motion for judgment notwithstanding the verdict (JNOV) but granted his motion for new trial on the issues of consent and waiver, finding that Schnitt met his burden of proof that Baral waived his right to damages and the evidence established that no waiver was made under duress. The trial court also granted Schnitt anti-SLAPP attorney fees.

We conclude the court properly awarded Schnitt anti-SLAPP fees but improperly denied his JNOV motion. These holdings render the appeals as they pertain to the court's new trial orders moot. Accordingly, we affirm the order awarding Schnitt anti-SLAPP fees but vacate the judgment and remand the matter with directions to enter judgment for Schnitt.

## BACKGROUND

### A. Background

In 2002, Schnitt started a company that processed financial transactions for companies.

---

[1] "SLAPP" is an acronym for "strategic lawsuit against public participation." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381, fn. 1 (*Baral*).) Further statutory references are to the Code of Civil Procedure. Hereafter, we refer to section 425.16, subdivision (b)(1) as section 425.16(b)(1).

In 2003, Baral owned an accounting firm that handled financial affairs in the entertainment industry.

With four other principals, Schnitt invited Baral to participate in his financial transactions company. Baral agreed to fund half of the company's costs—ultimately paying in $455,000—and lease the business's office space for "a 30% equity stake" in the company, which was named IQ BackOffice LLC. Baral's firm handled IQ's tax returns. By 2008, IQ had become profitable.

By 2010, the relationship between Schnitt and Baral had soured, and Schnitt and a majority of IQ's equity owners explored selling IQ. Schnitt retained investment banker Vivek Subramanyam to help find potential buyers.

One potential buyer, Live-It Investments (Live-It), offered $12.5 million for the company.

In October 2010, IQ and Live-It memorialized the terms of a prospective sale in a non-binding Letter of Intent (LOI), proposing that IQ's senior executives (Schnitt, Phil Jablonski, and Dennis Foster) would continue with the company after the sale and reinvest a substantial portion of the sale price in the new company. The LOI also proposed that Baral and other IQ owners would sell their interests in IQ for cash.

If the sale went through as planned, Baral's 30 percent interest in IQ was expected to be worth approximately $3.5 million.

In November 2010, Schnitt presented the Live-It offer and the LOI's terms to all of IQ's owners except Baral. The owners (except Baral) agreed to sell IQ to Live-It.

When Schnitt informed Baral of the terms of the proposed sale, Baral expressed reservations, complaining it would be

3

unfair to him. Nevertheless, Baral retained independent counsel, Gary Edelstone, who negotiated with Live-It for the sale, during which Baral never asked for a position at the new company nor an equity interest in it. Edelstone spent 150 hours and more than $77,000 in fees working on negotiations with Live-It on Baral's behalf.

Prior to the proposed sale, IQ drafted a sale agreement and retained the accounting firm Moss Adams to audit its finances.

The Moss Adams audit discovered that Baral had engaged in unauthorized transactions, and Mitch Baral, Baral's son and IQ's bookkeeper, had embezzled approximately $123,000 from the company.

In February 2011, Baral threatened to veto the sale to Live-It if the sales agreement did not expressly characterize him as "a Member and Manager" of the new company. After this demand was met, Baral urged Schnitt to finalize the sale, representing they "both ha[d] everything to gain" if it went through. Baral repeatedly urged the other owners to accede to the sale as well, and threatened to hold Schnitt liable if the deal failed to close.

On April 15, 2011, Baral and the other owners signed the sale's closing documents as well as a document titled "Unanimous Written Consent" prepared by Baral's counsel, pursuant to which they agreed they had "carefully reviewed and evaluated the Purchase Agreement" and "believe[d] it [was] in the best interest of the Company and its members."

Baral received $3.6 million from the sale.

Under Live-It's control, IQ's profits plummeted, and by 2016 the company had a negative cash flow and was over $6

4

million in debt. Schnitt thereupon repurchased IQ for $2.8 million.

**B.     Anti-SLAPP Proceedings**

In December 2011, Baral sued Schnitt for fraud, breach of fiduciary duty, and defamation, alleging Schnitt wrongfully took control of IQ and secretly negotiated the sale of the company to Live-It. The complaint alleged Schnitt unilaterally hired Moss Adams to investigate misappropriation of IQ's funds before the sale, controlled that investigation, gave Moss Adams false information, and directed Moss Adams not to interview Baral, resulting in the audit report's false conclusions that Baral had engaged in unauthorized transactions.

Baral alleged he suffered economic damages arising from: (1) "The loss of profits attributable to being prevented from negotiating for a continuing ownership interest subsequent to the sale of IQ's assets"; (2) "The loss of earnings attributable to being prevented from negotiating for a continuing employment or consulting position subsequent to the sale of IQ's assets"; and (3) "The loss of profits attributable to the value of IQ if it had been sold later than April of 2011."

Schnitt filed a demurrer and anti-SLAPP motion, and the trial court struck Baral's defamation claims as stemming from conduct protected by the litigation privilege, and sustained without leave to amend Schnitt's demurrer to five of the causes of action. Baral appealed and filed a first amended complaint, but abandoned the appeal after Schnitt filed another anti-SLAPP motion, which Schnitt subsequently withdrew.

In January 2013, Baral filed a second amended complaint, which as the Supreme Court described it, "plead[ed] four causes of action:  breach of fiduciary duty, constructive fraud, negligent

5

misrepresentation, and a claim for declaratory relief.  In support of those counts, Baral allege[d] as follows:  Schnitt violated his fiduciary duties by usurping Baral's ownership and management interests so that Schnitt could benefit from the sale of IQ to [Live-It].  Schnitt sold a 72.6 percent interest in IQ based on his representation that he was its sole member and manager, and negotiated an employment position and ownership interest for himself without Baral's knowledge or consent.  Schnitt also excluded Baral from the Moss Adams investigation in an effort to coerce his [Baral's] cooperation in the sale of the business.  After the sale of IQ closed, Baral unsuccessfully renewed his efforts to provide information to the Moss Adams auditors.  The second amended complaint sought an injunction to reopen the audit with Baral's participation, and to bar Schnitt from interfering with any corrections Moss Adams might make to its report."  (*Baral, supra*, 1 Cal.5th at p. 383, fn. omitted.)

Baral also requested declaratory relief in the form of a judicial declaration that he was permitted to submit additional information to Moss Adams, and Schnitt was not permitted to exercise his rights as co-manager to prevent the submission of that additional information to Moss Adams.

Schnitt filed another anti-SLAPP motion entitled "Special Motion To Strike Certain Allegations In The Second Amended Complaint," seeking to strike all references to the Moss Adams investigation and audit report as protected activity under the anti-SLAPP statute, and also as activity protected by the litigation privilege in Civil Code section 47, subdivision (b).  The trial court denied the motion and we affirmed, concluding that a special motion to strike under the anti-SLAPP statute may not result in the striking of particular allegations of protected

6

activity that are asserted as grounds for relief, but must be addressed to an entire and indivisible cause of action. (*Baral v. Schnitt* (2015) 233 Cal.App.4th 1423.) The Supreme Court reversed on this issue. (*Baral*, *supra*, 1 Cal.5th at p. 397.)

Upon remand, we concluded that the Moss Adams allegations described protected conduct, and further concluded that Baral failed to meet his burden of showing he had a probability of prevailing on those allegations. We therefore reversed the trial court's order denying Schnitt's special motion to strike, awarded appellate costs to Schnitt, and remanded the matter for a determination of entitlement to attorney fees under the anti-SLAPP statute. (*Baral v. Schnitt* (Feb. 23, 2017, B253620) [nonpub. opn.].)

The trial court awarded Schnitt anti-SLAPP attorney fees in the amount of $279,197.80. Baral appeals this award.

## C.    Schnitt's Answer

Schnitt answered Baral's amended complaint and denied liability, alleging as a separate defense that by agreeing to the sale of the company and negotiating and executing the transactional documents, Baral waived any claim arising from the sale of IQ to Live-It. Schnitt later amended the answer to clarify that his defense included the allegation that Baral was estopped from maintaining this action or recovering anything from Schnitt as a result of his, Baral's, agreement to sell IQ, and further that his negotiation and execution of the transactional documents required to consummate the sale constituted a ratification of the sale.

The matter proceeded to trial on Baral's third amended complaint, which he later amended a fourth time.

**D. Trial**

**1. Rulings in Limine**

Because Baral's allegations concerning the Moss Adams report had been stricken, the trial court ruled in limine that evidence concerning the accuracy of the report was inadmissible, and factual allegations in connection with it could not serve as a basis of liability. However, the court also ruled that Baral could rely on the report to explain his state of mind and agreement to the sale.

Schnitt petitioned us for a writ of mandate on this latter issue, which we denied.

**2. Testimony**

**a. liability**

At trial, Baral testified that Schnitt's pre-sale machinations deprived Baral of the opportunity to receive a position and stock in the new company after the sale.

Baral admitted that he signed the closing documents for the sale of IQ to Live-It, but claimed he did so under duress because he feared that the other IQ owners would sue him for disrupting the deal, that his son would go to jail for embezzlement, or that Schnitt could leak the Moss Adams findings that he had engaged in irregular transactions.

However, he was unable to identify any instance in which Schnitt directly threatened to sue him if he stopped the sale—he claimed that Schnitt had stated at the owners' initial pre-sale meeting, which Baral did not attend, that he would hold Baral liable if the sale fell through—and admitted that Schnitt had never threatened to report the embezzlement or release the Moss Adams Report.

8

### b. damages

Baral testified that due to Schnitt's misconduct, he was forced to sell the business prematurely, and "if he had his way, he would never have sold the company" in 2011, and "there are damages that flow from that."

#### (1) *job and stock theory*

First, Baral testified, he lost an opportunity to see if there was a place for him in the new organization, although he admitted he did not know whether a job would have been available. Baral further admitted that he never asked for a position with the new company nor for an opportunity to be paid in stock rather than cash. He testified that the new company would likely *not* have needed a chief financial officer (Baral's role at IQ) because Live-It "would certainly have somebody at that level."

Second, Baral testified that he lost the opportunity to take an equity position in the new company post-sale. When asked whether he "wanted to buy into the new company," Baral responded, "I wanted the opportunity to have a discussion . . . . [¶] . . . [¶] I wanted to be on the same level as David Schnitt. He got opportunities that I did not. So I just needed and wanted to have the opportunities to have these kinds of communications to understand what exactly—who's Ayala? What are they bringing to the table. My knees were cut from under me."

When asked, "So you wanted the opportunity to have a conversation, but you're not sure whether you would have taken advantage of the opportunity or not?" Baral responded, "That's a fair statement."

Baral's damages expert, Kevin Henry, testified over Schnitt's objection that if Baral had obtained a job and had been

9

paid for his interest in the company partially in stock, he could have sold that stock at a profit at some point in the future, obtaining approximately $3 million more than the $3.6 million he received from the IQ sale.

However, Henry acknowledged that he based his calculations on IQ's projections prepared in 2010 to forecast what might happen to the new business after the sale, not on the new company's actual post-sale performance, during which the company's value declined substantially. He acknowledged that had he based his calculations on actual post-sale events, Baral suffered no damages because "he would have gotten less than he got on the all-cash transaction."

Henry acknowledged that IQ's projections were "quite preliminary" and not meant to be "definitive," and when asked, "Are you expressing an opinion on the reasonableness of those projections?" he answered, "No."

(2) *hold and sell theory*

Baral also claimed that had IQ never been sold to Live-It, its profitability would have increased, and at some point he could have sold it for more than the $3.6 million he realized from the Live-It sale.

Henry testified, over objection, that he assumed based on a conversation with Baral that Baral would have been interested in holding onto IQ, and "selling the business when revenues reached $30 million." He testified that if IQ had never been sold to Live-It, its revenues would have reached $30 million in 2015, and Baral and IQ's other owners would have been able to sell IQ for $100 million.

Again however, Henry acknowledged that his opinion was based on IQ's projections prepared in 2010, and he had made no "effort to determine the likelihood of the company" actually "achieving" that valuation and revenue target "in 2015."

Gilbert Santa Maria, Live-It's executive managing the sale, testified that Live-It was never interested in hiring Baral or offering him a stock deal. Santa Maria testified that Live-It offered stock only to those it was interested in retaining, and only to keep them invested in the company going forward. When Sandeep Tandon, another IQ owner, asked to buy stock, Live-It refused because it had no intention of hiring him.

Dennis Foster, one of IQ's owners, testified that a post-sale job with the new business would have been "challeng[ing]" for Baral because he "had his own business" in California, "R.C. Baral & Company," and "it wasn't really in the realm of possibility for him to sort of work for this company" in "the Philippines."

Schnitt testified that Live-It's efforts to expand the company post-sale increased costs and reduced quality and productivity, and by 2016 the business was effectively insolvent, could not secure a purchase offer, and was going to cease operations. Baral presented no rebutting evidence.

In closing argument, Baral's counsel stated, "We're not saying that Mr. Baral was asking for—for a full-time job. We are not saying that—what we are saying is he deserved a seat at the table."

### 3. Jury Instructions

Schnitt proposed jury instructions on his affirmative defenses of estoppel, waiver, consent, and ratification. The court elected to deliver instructions regarding consent and ratification, but not estoppel or waiver, viewing them to be duplicative.

The court ultimately instructed the jury that "To succeed in proving consent, in this case, Mr. Schnitt must prove that Baral voluntarily consented to the sale of IQ BackOffice and that his

11

consent was not obtained under fraud, duress, or undue influence."

When Schnitt objected to the burden of proof of lack of duress thus being placed on him, the court overruled the objection but stated: "I want to make sure I'm clear for the appellate courts" that Schnitt had the burden of proving a lack of duress.

### 4. Verdict

The jury rendered a general verdict in Baral's favor "for Breach of Fiduciary Duty and/or Constructive Fraud" and awarded him $2.5 million in compensatory damages.

The jury also answered "yes" to a "Special Question" proposed by Baral asking whether it found by clear and convincing evidence that Schnitt "acted with malice, fraud or oppression, or engaged in despicable conduct."

### 5. Punitive Damages Phase

In the punitive damages phase, Schnitt's financial statement indicated his personal net worth was $3.57 million.

By a 10-2 verdict, the jury awarded Baral $1 million in punitive damages.

## E. Post-Trial Motions

Schnitt moved for a new trial and JNOV. He argued a new trial was required because the jury's "rejection of Mr. Schnitt's consent defense" was based on "insupportable claims of duress" that were contradicted by overwhelming evidence that Baral wanted the sale of IQ to go forward.

Schnitt moved for JNOV on the ground that Baral failed to present substantial evidence that Schnitt's conduct caused him any harm. He argued there was no evidence that Live-It would have offered Baral a job, that he would have accepted, that he wanted to sell IQ when it reached $30 million in revenue, or that

IQ would have ever reached a point where a sale more favorable than the sale to Live-It would have occurred.

The trial court denied Schnitt's JNOV motion and partially granted his new-trial motion. It agreed with the jury's findings concerning "liability/damages," but found that a new trial was warranted on the issue of consent/waiver/ratification because Schnitt met "his burden of proof" to "demonstrate that [Baral] legally waived his right to assert his various claims for damages," and "the evidence established that [Baral] was not under 'duress' when he consented and/or approved/ratified the sale of IQ BackOffice, LLC."

The court further ruled that a partial new trial was appropriate due to instructional error, finding that the instruction stating that Schnitt had the burden to prove Baral was not under duress "may have been in error, since the burden of proof to demonstrate 'duress' may actually have been upon" Baral.

The court stated that if the "above-stated limited new trial order" is deemed "legally improper" on appeal, then Schnitt's new-trial motion "is granted in its entirety."

Both parties appeal.

## DISCUSSION

### I. SCHNITT'S APPEAL

#### A. Damages

Schnitt contends the trial court erred in denying his JNOV motion because no evidence indicated that Baral suffered any compensable damages. We agree.

A motion for JNOV may be brought after a verdict has been rendered but before judgment has been entered on the verdict. (§§ 629, 659.) A party is entitled to JNOV "where, viewing the evidence in the light most favorable to the party securing the

13

verdict, the evidence compels a verdict for the moving party as a matter of law." (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1194.) "In general, ' "[t]he purpose of a motion for judgment notwithstanding the verdict is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation." ' " (*Ibid*.) A motion for JNOV tests the legal sufficiency of the evidence proffered or presented by the opposing party. (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583.)

We review an order denying a JNOV motion for "substantial evidence—contradicted or uncontradicted—support[ing] the jury's conclusion." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) We may not reweigh evidence or consider witnesses' credibility. (*In re Coordinated Latex Glove Litigation* (2002) 99 Cal.App.4th 594, 606.) Rather, we view the evidence in the light most favorable to the jury's verdict, disregard conflicting evidence, and draw all legitimate inferences in favor of the verdict. (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167.)

"Constructive fraud is any breach of duty that, without fraudulent intent, gains an advantage to the person at fault by misleading another to his prejudice." (*Tindell v. Murphy* (2018) 22 Cal.App.5th 1239, 1250; see also Civ. Code, § 1573.) "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) Both torts require that the plaintiff suffer injury due to the defendant's breach of duty.

"[D]amages which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal basis for

14

recovery." (*Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 577.)

Here, Baral contends he suffered damages due to Schnitt's conduct resulting in Baral losing two opportunities: (1) The opportunity to receive a position and stock in the new company after Live-It bought IQ; and (2) the opportunity to hold onto his interest in IQ and sell it at a later date for more than he realized from the sale to Live-It. The first theory of damages assumed that Baral participated fully in the 2011 transaction in the same manner as Schnitt. The second assumed the 2011 IQ sale did not occur until 2015.

### 1.    Lost Job and Stock Opportunity

Baral's first claim of injury is less clear on appeal than it apparently was at trial. At trial he claimed he was injured by loss of earnings and profits attributable to Schnitt preventing him from negotiating for employment and an ownership interest subsequent to the sale of IQ to Live-It.

Baral's hope to derive such earnings and profits depended on the happening of two major contingencies: (1) Live-It's willingness to offer Baral employment on such terms as he would accept; and (2) Live-It's willingness to offer Baral a stock package on terms he would accept.

No evidence supports either contingency. Baral himself testified he did not know whether he would have accepted employment with or an ownership interest in Live-It, but he wanted the opportunity to discuss those matters with Live-It. Henry testified that based on an unspecified and nonspecific conversation he had with Baral, he assumed Baral would accept stock and a position with Live-It post-sale, but an expert opinion based on a foundationless assumption is speculative, and has no evidentiary value. (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510.)

15

On the other hand, Gilbert Santa Maria, Live-It's executive who managed the IQ purchase, testified Live-It was never willing to hire Baral or offer him stock in the new entity. And Dennis Foster, one of IQ's owners, testified that a post-sale job with the new business would have been unfeasible for Baral because he had his own business in California, and the new entity would be based in the Philippines.

Where no evidence suggests a contingency is probable, expectations based on the contingency can only be speculative. A plaintiff may not recover on a theory of speculative harm. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 743 ["nominal damages, speculative harm, and the mere threat of future harm are not actual injury"]; see *Ramsey v. Penry* (1942) 53 Cal.App.2d 773, 778 (*Ramsey*) ["speculative damages may not be recovered"].)

*Ramsey* is directly on point. There, the plaintiff created a corporation and contracted with the defendants to sell at least $15,000 worth of the corporation's shares to third parties. When defendants wrongfully failed to do so the corporation essentially failed, and plaintiff lost the opportunity to receive shares in the corporation himself. (*Ramsay*, *supra*, 53 Cal.App.2d at p. 778.) However, at trial, the evidence established there was no buyer willing to purchase the stock. (*Id*. at pp. 778-779.) The court reversed a judgment against the defendants, holding that even had they been faithful to the company, "what profits plaintiff might have made are speculative and uncertain." (*Id*. at p. 780.)

Here, there is no substantial evidence in the record to show that Baral could have realized any earnings or profit from Live-It, because even had Schnitt been faithful to his fiduciary duties, no evidence suggests Live-It was willing to hire Baral or grant him an interest in the company going forward.

16

Baral argues *Ramsey* is inapposite because there the company had no purchasers because it was a new, unknown entity, whereas here IQ "was an established business with a proven track record of success." Baral misses the point. Whether IQ was established or not, both Baral and the *Ramsey* company shared a key characteristic: They had no offers. Evidence of damage resulting from the wrongful deprivation of an improbable offer is too speculative and uncertain to support a judgment.

On appeal, Baral shifts somewhat from the lost-profits theory presented at trial, arguing that "[w]hether the buyer would have offered Baral a job or stock or whether Baral would have accepted any offers from the buyer is irrelevant," because he "was harmed in not being offered the same *opportunities* as Schnitt to obtain stock and/or employment with the resulting company that acquired IQ LLC's assets." (Italics added.) But no evidence suggests any such opportunity existed.

Baral relies on *Bardis v. Oates* (2004) 119 Cal.App.4th 1 for the proposition that in an action for fraud and breach of fiduciary duty, lost-opportunity damages may be recovered even where it turns out no opportunity existed. The argument is without merit. In *Bardis*, the managing partner of a partnership marked up invoices for goods and services purchased by the partnership, and funneled the markup to himself. (*Id.* at p. 11.) On appeal the partner argued the partnership suffered no damages because had he asked the partners to be reimbursed, they would have been duty bound to agree that the markup was reasonable. (*Id.* at p. 13.) *Bardis* held that a partner will not "be absolved from committing fraud and breach of fiduciary duty because of what *might* have occurred had [the partner] acted properly under a hypothetical set of circumstances." (*Ibid.*) The partner was "prohibited from engaging in self-dealing in any way," and was therefore obligated to replace the markup. (*Ibid.*)

17

*Bardis* is inapposite. There, the court held only that it was no defense in a self-dealing case for a partner to claim his self-dealing was reasonable, because partnership law prohibited him from engaging even in reasonable self-dealing. The court made no blanket statement about hypothetical circumstances being always irrelevant. Here, in seeking lost earnings and profits "attributable to" a lost opportunity, it is Baral, not Schnitt, who relies on a hypothetical set of circumstances—that the opportunity he bemoans actually existed, i.e., that Live-It would have made profitable offers to him had Schnitt given him the chance to negotiate for them. As the proponent for such a theory—upon which, under the rule of *Jordache*, *Mozzetti*, and *Ramsey*, his recovery depended—Baral bore the burden of producing reasonably reliable evidence that the circumstances would manifest. As discussed above, he produced no such evidence. If any pertinent rule can be taken from *Bardis*, it is that no tenable position can be founded on a phantom occurrence.

### 2. Future Sale Opportunity

Baral also claims he was damaged by loss of the opportunity to wait until sometime after 2011 to sell IQ, when he could sell his interest in the company for more than the $3.6 million he realized from the sale to Live-It. He speculates the time to sell would have been when IQ generated $30 million in revenue, which IQ projected would occur by 2015.

However, no admissible evidence suggested that IQ could have ever generated $30 million in revenue, that Baral would have wanted to sell IQ when it generated that much revenue, that Baral could have persuaded the other owners either to wait that long (or sell even if they did wait), or that Baral could have found a buyer offering a more favorable price than he received from Live-It.

18

Henry assumed many of these facts based on an unspecified conversation with Baral, but Baral himself testified to none of them.  An expert's factual assumption does not itself constitute substantial evidence of any case-specific fact.  (*People v. Sanchez* (2016) 63 Cal.4th 665, 686; *Hongsathavij v. Queen of Angels / Hollywood Presbyterian Medical Center* (1998) 62 Cal.App.4th 1123, 1137.)

Although Henry relied on IQ's own pre-sale projections that it would reach $30 million in revenue by 2015, he testified the projections were "quite preliminary" and "meant to not be definitive, but rather a starting point," and expressly refused to declare they were reasonable.

Projected lost profits from a business are generally " 'not recoverable for the reason that their occurrence is uncertain, contingent and speculative,' " with the exception that " 'anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' "  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 774 (*Sargon*).)

To be reasonably reliable, evidence of projected lost profits must be "tangible  . . . with a 'substantial and sufficient factual basis' rather than by mere 'speculation.' "  (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 885 [expert testimony that store flooding caused $50 million in lost profits lacked reasonable certainty where expert speculated new Web site would have generated substantial sales]; see also *Sargon, supra*, 55 Cal.4th at p. 775 [lost profits that are uncertain, hypothetical and speculative are nonrecoverable]; *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 766 [evidence of lost profits from breach of property sale agreement with reasonable certainty]; *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281, 288-291 [same]; *Vestar Development II, LLC v.*

*General Dynamics Corp.* (9th Cir. 2001) 249 F.3d 958, 962 [dismissing claim based on future profits that plaintiff "hoped to earn from the shopping center it had planned to build on the parcel it was attempting to buy"; there was "no way to evaluate, other than through speculation, the profits that it might have made"].)

Here, even if there were evidence that Baral wanted to sell IQ once it generated $30 million in revenues, and could both persuade the other owners to do so and find a buyer, no reasonably reliable evidence supported his claim that such revenues were achievable. Only Henry, Baral's expert, relied on IQ's projections to anticipate such revenues, and he declined to opine that the projections were reasonable.

In sum, no admissible evidence suggested that Baral would or could have sold IQ for more than the $3.6 million he received.

Therefore, his claim of damages under either of his theories fails as a matter of law, and a judgment for Schnitt should have been entered.

## B. Other Contentions

Schnitt argues that JNOV should have been granted also because Baral's claim of duress fails as a matter of law. Given our holding above, we need not reach this issue.

Schnitt also argues that the award of punitive damages must be vacated because the jury made no finding that he acted with oppression, fraud or malice. We need not reach this issue either because Baral's claim for punitive damages fails for lack of predicate compensatory damages. (See *Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147 ["actual damages are an absolute predicate for an award of exemplary or punitive damages"].)

## C. New Trial

Schnitt argues that absent a full JNOV, we must reverse the partial denial of his motion or new trial and remand the

matter for a full new trial.  Given our holding above, this argument is moot.

## II.    BARAL'S APPEAL

Baral contends the court erred in ordering a partial new trial and in awarding Schnitt anti-SLAPP fees.  Given our holding above, Baral's appeal of the order granting a partial new trial is moot.

### A.    Anti-SLAPP Fees

Baral contends the trial court abused its discretion in awarding Schnitt anti-SLAPP attorney fees.  We disagree.

A "prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." (§ 425.16, subd. (c)(1).)  "[A]ny SLAPP defendant who brings a successful motion to strike is entitled to mandatory attorney fees."  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131; see also *Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 946 [a defendant that succeeds "in full on their motion to strike" is a prevailing party for purposes of anti-SLAPP attorney fees].)  "[A] party who partially prevails on an anti-SLAPP motion must generally be considered a prevailing party unless the results of the motion were so insignificant that the party did not achieve any *practical benefit* from bringing [it]"—a determination that "lies within the broad discretion of a trial court."  (*Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 340 (*Mann*), italics added.)

Here, Schnitt moved to strike Baral's claims to the extent he sought to impose liability based on the preparation of the Moss Adams fraud report.  We held these allegations would be stricken because they were subject to the litigation privilege.  (*Baral v. Schnitt, supra*, B253620.)  Schnitt thus obtained all the relief he

sought. Therefore, pursuant to our Supreme Court's holding in *Ketchum v. Moses*, Schnitt was the prevailing party as a matter of law, and entitled to attorney fees. (*Ketchum v. Moses*, *supra*, 24 Cal.4th at p. 1131.)

Baral argues Schnitt was not the prevailing party because his victory on the anti-SLAPP motion garnered him no practical benefit, as the jury entered a $3.5 million verdict against him. We disagree.

First, Schnitt wholly prevailed on his anti-SLAPP motion, making him the prevailing party as a matter of law and rendering the practical benefit test unnecessary. (*Bel Air Internet, LLC v. Morales*, *supra*, 20 Cal.App.5th at p. 946.) Second, even were we to employ the practical benefit test, by eliminating Baral's claims based on the Moss Adams report, Schnitt achieved the practical benefit of "narrow[ing] the scope of the lawsuit, limiting discovery, reducing potential recoverable damages, and altering the settlement posture." (*Mann*, *supra*, 139 Cal.App.4th at p. 340.) That Baral eventually prevailed in the litigation is irrelevant to apportionment of anti-SLAPP attorney fees. A contrary rule would expand anti-SLAPP litigation beyond all reason, requiring a mini-trial after each main trial to adjudicate whether the defendant's achievement conveyed a "practical" benefit.

## DISPOSITION

The judgment is reversed and the matter remanded, and the trial court is ordered to enter judgment in favor of Schnitt. The order granting Schnitt anti-SLAPP fees is affirmed. Schnitt is to recover costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

23